_____

No. 95-3325
_____

United States of America,          *
                                   *
         Plaintiff-Appellee,        *
                                   *
    v.                             *
                                   *
Antwon A. Warfield,                *
                                   *
         Defendant-Appellant.       *

                                        Appeals from the United States
                                        District Court for the
                                        Western District of Missouri.


_____

No. 95-3326
_____

United States of America,          *
                                   *
         Plaintiff-Appellee,        *
                                   *
    v.                             *
                                   *
Brian M. Thomas,                   *
                                   *
         Defendant-Appellant.       *


                      _____

          Submitted:  March 13, 1996

             Filed:  October 2, 1996
                      _____

Before MCMILLIAN, BEAM, and HANSEN, Circuit Judges.
                      _____


HANSEN, Circuit Judge.

Antwon A. Warfield and Brian M. Thomas appeal from the final judgments of the district court[1] after they were convicted of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d), conspiracy to commit armed bank robbery in violation of 18 U.S.C. § 371, and Thomas was convicted of aiding and abetting armed bank robbery in violation of 18 U.S.C. §§ 2 and 2113(a) and (d). Both raise various trial-related rulings as a basis for reversal of their convictions. After carefully considering the record, we affirm the judgments of the district court.

I.

On December 8, 1993, the Boatmen's Bank at 8550 Holmes in Kansas City, Missouri, was robbed by several individuals. It was robbed again on December 17, 1993. The two robberies were conducted in the same manner, and in a manner identical to the robberies of several area fast-food restaurants earlier that year. Prior to arriving at the business to be robbed, the robbers would remove the license plates from their vehicle. Two robbers would enter the business wearing nylon stocking masks and work gloves. One robber carried a firearm and stood by the door, covering customers and employees. The other robber would vault over the counter, open the cash drawer, and remove the entire cash tray and its contents. With the cash tray in hand, the robbers would flee the premises to the getaway car, which a third robber had strategically positioned for a quick getaway. The robberies were always executed extremely rapidly, with the time the robbers spent inside the establishment lasting around a minute.

Warfield was charged in the superseding indictment with one count of armed bank robbery and one count of conspiracy to commit

---

[1]The Honorable Joseph E. Stevens, Jr., United States District Judge for the Western District of Missouri.

-2-

armed bank robbery in connection with the December 17, 1993, robbery of Boatmen's Bank.  Thomas was charged with armed bank robbery in connection with the December 8, 1993, robbery of Boatmen's Bank, and aiding and abetting armed bank robbery and conspiracy to commit armed bank robbery stemming from the December 17 robbery.  The case proceeded to trial, and a jury found the Appellants guilty on each count with which they were charged.  After being sentenced by the district court, Warfield and Thomas appeal.

## II.

WARFIELD'S APPEAL

A.

Warfield argues that the district court, adopting the report and recommendation of a United States Magistrate Judge,[2] abused its discretion by overruling his motion to sever his trial from co-defendant Thomas's trial.  "[W]e review the district court's denial of a motion for severance for an abuse of discretion which resulted in `severe or compelling prejudice.'"  United States v. Fregoso, 60 F.3d 1314, 1328 (8th Cir. 1995) (quoting United States v. Rimell, 21 F.3d 281, 289 (8th Cir.), cert. denied, 115 S. Ct. 453 (1994)).  "To show such prejudice, a defendant must establish something more than the mere fact that his chance for acquittal would have been better had he been tried separately.  He must affirmatively demonstrate that the joint trial prejudiced his right to a fair trial." United States v. Jackson, 64 F.3d 1213, 1217 (8th Cir. 1995) (internal quotation omitted), cert. denied, 116 S. Ct. 966 (1996).  Finally, we observe that "[r]arely, if ever, will it be

---

[2]The Honorable John T. Maughmer, Chief United States Magistrate Judge for the Western District of Missouri.

-3-

improper for co-conspirators to be tried together." Id. (internal quotations and citation omitted) (alteration in original).

"When a defendant moves for a severance, a district court must first determine whether joinder is proper under Federal Rule of Criminal Procedure 8. If joinder is proper, the court still has discretion to order a severance under Federal Rule of Criminal Procedure 14." United States v. Darden, 70 F.3d 1507, 1526 (8th Cir. 1995), cert. denied, 116 S. Ct. 1449 (1996). Rule 8 and Rule 14 are to be given a liberal construction in favor of joining the trial of several defendants. Id.

Rule 8 permits the joinder of defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8. For proper joinder under this provision, "[i]t is not necessary that every defendant have participated in or be charged with each offense." Darden, 70 F.3d at 1527 (internal quotations omitted). Under Rule 8 then, the joinder of Warfield and Thomas was clearly appropriate because the superseding indictment alleged that they conspired to commit, and Warfield subsequently engaged in while Thomas aided and abetted, armed robbery of Boatmen's Bank on December 17, 1993.

If joinder is proper under Rule 8, the defendant seeking severance has the heavy burden of demonstrating that a joint trial will impermissibly infringe his right to a fair trial. Id. This burden may be satisfied by showing that the jury was unable to compartmentalize the evidence against each defendant or that the defendants' defenses are irreconcilable. Jackson, 64 F.3d at 1217.

Warfield claims that he satisfied this onerous burden because the jury was unable to compartmentalize the evidence with respect to each defendant. Specifically, Warfield observes that a plethora

-4-

of evidence was presented concerning Thomas's past criminal involvement, specifically Thomas's arrest on June 16, 1993, his participation in robbing several restaurants, and his involvement in the December 8, 1993, robbery of Boatmen's Bank. Warfield claims that with these numerous instances of bad conduct presented against Thomas, the "spillover effect" deprived him of his constitutional right to a fair trial. We disagree.

This case involved co-conspirators who were charged in the indictment for their respective roles in the December 17 robbery. A good deal of evidence presented at trial concerned the plan, and the execution of the plan, to rob the Boatmen's Bank on December 17, and the Appellants' involvement therein. Further, the district court instructed the jury that it was to view the evidence presented against one defendant as applicable to only that defendant and we assume, as we must, that the jury followed this instruction. Fregoso, 60 F.3d at 1328. Finally, Warfield presents nothing more than an unsupported assertion that he was prejudiced by the failure to sever. However, "a claim of potential prejudice is not enough to prevail on this issue." Jackson, 64 F.3d at 1217.

Warfield thus has failed to carry his heavy burden to show that his joint trial with co-conspirator Thomas prejudiced his right to a fair trial. Accordingly, we reject Warfield's claim that the district court erred by denying his motion for severance.

B.

Warfield next claims that the district court erred by failing to issue a Writ of Habeas Corpus Ad Testificandum, compelling one Terrance Davis to appear at trial to testify. At the time Warfield made his request, Davis was incarcerated in the United States Penitentiary at Leavenworth, Kansas, having been tried and convicted for his participation in the same December 17, 1993,

robbery of Boatmen's Bank for which Warfield was being tried. Davis's direct appeal was pending at that time before this court. See United States v. Davis, 65 F.3d 172, 1995 WL 507320 (8th Cir. 1995) (unpublished opinion affirming conviction). Warfield sought to question Davis about the December 17 robbery.

The district court held a hearing on the issue with Davis's attorney present. Davis's counsel stated to the court in no uncertain terms that if the court required Davis to appear and take the stand, Davis would unequivocally exercise his Fifth Amendment privilege against self-incrimination. In light of counsel's representation, the district court overruled Warfield's request that Davis be compelled to appear and take the stand.

Warfield takes issue with the district court's ruling, claiming that the court simply speculated that Davis would exercise his Fifth Amendment privilege against self-incrimination. We have held that a representation to the district court by a witness's counsel that the witness would exercise his Fifth Amendment rights if called to testify is sufficient for the district court to refuse to compel that witness to appear. See United States v. Swanson, 9 F.3d 1354, 1359 (8th Cir. 1993) (district court's exclusion of testimony by witness not improper when witness's attorney informed court that witness would assert Fifth Amendment right of self-incrimination if called). Thus, in this case, Davis's counsel's representation that Davis would exercise his Fifth Amendment privilege against self-incrimination, coupled with the fact that Davis's appeal was still pending before this court, was a sufficient basis for the district court to conclude that that is precisely what Davis would have done.

Warfield claims that under this court's holding in United States v. Doddington, 822 F.2d 818 (8th Cir. 1987), the district court should have compelled Davis's presence at trial and

determined at that time whether Davis would invoke the privilege against self-incrimination.  Doddington, however, actually supports the district court's refusal to compel Davis's presence.  There we held that "a defendant does not have the right to call a witness to the stand simply to force invocation of the right against self-incrimination in the presence of the jury."  822 F.2d at 822.  See also United States v. Robaina, 39 F.3d 858, 862 (8th Cir. 1994) (A "defendant's right to compulsory process does not include the right to compel a witness to waive his or her Fifth Amendment privilege against self incrimination.").

Finally, Warfield claims that if Davis had exercised his Fifth Amendment rights, the district court could have granted Davis "judicial" immunity or compelled the government to offer Davis use immunity.  This argument also fails.  We have not heretofore recognized the concept of "judicial" immunity, see Robaina, 39 F.3d at 863,[3] and decline to do so here.  Additionally, use immunity can only be granted when it is formally requested by the Attorney General, id., and the district court is without power to compel the government to grant a witness immunity.  Doddington, 822 F.2d at 821.  See also Robaina, 39 F.3d at 863 (holding that district court correctly concluded that it could not order the government to grant use immunity).

---

[3]"This concept arises from case law, which holds that a court possesses an inherent power to grant a witness use immunity in order to effectuate the defendant's compulsory process right to secure essential exculpatory testimony."  Robaina, 39 F.3d at 863 n.3.  Even if we were to formally recognize the concept, which we decline to do here, the doctrine is applicable only if the proffered testimony of the witness is "clearly exculpatory." United States v. Hardrich, 707 F.2d 992, 993-94 (8th Cir.), cert. denied, 464 U.S. 991 (1983).  In this case, however, it does not appear that Warfield's counsel had discussed the case with Davis, and thus we cannot conclude that Davis's testimony would have been clearly exculpatory, no proffer of the same having been made.

Accordingly, we reject Warfield's claims that the district court erred by failing to order Davis's presence at trial.[4]

C.

Warfield contends that the district court impermissibly interfered with his closing argument. To put this argument in context, a bit of background information is required. The government presented evidence that on December 17, 1993, sometime in the late morning or early afternoon, Jeff Hudspeth and Troy Taylor met with Thomas at Thomas's residence and Warfield arrived approximately one-half hour later. The four discussed robbing the Boatmen's Bank, and subsequently did so at approximately 2:00 p.m. To combat this evidence of his involvement in the robbery, Warfield employed an alibi defense, presenting evidence that on December 17 he was at his place of employment the entire morning and that in the afternoon hours he was with his girlfriend, Davetta Cooksey, and later at a chiropractor's office. Significantly, during cross-examination of Taylor and Hudspeth by Warfield's counsel, both witnesses agreed that the purported meeting at Thomas's residence took place in the morning. The obvious purpose behind obtaining this testimony from Taylor and Hudspeth was to argue to the jury that Warfield could not have been at the meeting because he was at his place of employment all morning.

Warfield's counsel was in the midst of making that argument in his closing argument when the following exchange took place:

> Mr. Mullen (Warfield's counsel): But what do Hudspeth and Taylor say? What is the testimony of these liars? There is a meeting that occurs that morning. No question

---

[4]Having reached this conclusion, we decline to address the government's alternative argument that Warfield's request to have Davis appear was untimely.

> she wouldn't lie.  So they have to be lying.  And if they are lying --
>
> Mr. Newbert (prosecutor):  Your honor.
>
> The Court:  Just a minute.

(Trial Tr. at 928-29.)  The court then informed Warfield's counsel at a sidebar held outside of the jury's hearing that characterizing the meeting as having taken place in the "morning" was "deceptive," that he was implying something not in the record, and informed counsel that counsel could, if he wished, argue that the meeting took place "shortly before noon."  (<u>Id.</u> at 929.)

Warfield contends that the district court, by restricting his counsel to argue that the purported meeting took place "shortly before noon," hindered counsel's ability to outline the discrepancy in the witness's testimony.  Warfield points out that ordinarily counsel is permitted wide latitude in making closing argument and that in this case the district court's actions impermissibly restricted this latitude, which in turn prejudiced his defense.  We disagree.

We afford district courts wide latitude in controlling closing arguments.  <u>United States v. McGuire</u>, 45 F.3d 1177, 1189 (8th Cir.), <u>cert. denied sub nom.</u> <u>Mandacina v. United States</u>, 115 S. Ct. 2558 (1995).  In this case, the court was well within its discretion in suggesting to Warfield's counsel that he characterize the meeting as occurring "shortly before noon" rather than in the morning.  Although Taylor and Hudspeth stated that the meeting took place in the morning, they both testified that the meeting occurred around the noon hour.  The district court was justifiably concerned that, although counsel's description of the meeting taking place in the morning was technically correct, this characterization created the potential that the jury would be misled.  The district court's requirement that Warfield's counsel,

-9-

if he wished to further discuss the time that the meeting took place, characterize it as occurring "shortly before noon" did not preclude counsel from arguing the alibi theory of defense because his client's time card showed he left his workplace in Olathe, Kansas, at noon and, more importantly, confined counsel's argument to the evidence presented.

The district court committed no abuse of discretion by its actions with respect to Warfield's counsel's closing argument.

D.

Warfield contends that the district court erred by giving the jury an <u>Allen</u>[5] instruction after the jury indicated that it was unable to reach a verdict with respect to one defendant. The jury received the case at 12:45 p.m. on the fifth day of trial. That same afternoon, at approximately 4:00 p.m., the jury sent a note to the district judge, stating "Decision on one defendant and deadlocked on the other. What should we do?" (Trial Tr. at 948.) After a discussion with the parties, the court reconvened the jury in the courtroom at 4:30 p.m. and gave it an instruction modeled after § 10.02 of the Eighth Circuit Manual of Model Criminal Jury Instructions.[6] About an hour after the jury received the <u>Allen</u> instruction, it returned with guilty verdicts against both Appellants.

---

[5]"Named after <u>Allen v. United States</u>, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896), `[t]hese charges expressly direct jurors to reconsider their positions, and address the minority or dissenting jurors alternatively, when a majority is for conviction or when a majority is for acquittal.'" <u>United States v. Cortez</u>, 935 F.2d 135, 140 n.4 (8th Cir. 1991) (quoting <u>Potter v. United States</u>, 691 F.2d 1275, 1277 (8th Cir. 1982)).

[6]The full text of the district court's instruction is set forth in Appendix A at the end of this opinion.

Warfield acknowledges that this court has consistently approved the giving of an <u>Allen</u> instruction to a deadlocked jury. Nonetheless, he argues that in the context of this case, such an instruction was erroneous because of its coercive nature, particularly given the district court's failure to question the jury regarding its numerical division. He also claims that the instruction should have been given <u>before</u> the jury retired to deliberate, rather than after deadlock had occurred. We reject these arguments.

Initially, we dismiss Warfield's suggestion that the district court committed error by <u>not</u> inquiring about the numerical division of the jury. The rule is clearly to the contrary. It is a <u>per se</u> ground for reversal to do so. <u>United States v. Webb</u>, 816 F.2d 1263 (8th Cir. 1987). The Supreme Court emphatically said so in <u>Brasfield v. United States</u>, 272 U.S. 448 (1926). Our circuit's case law declared it so before the Supreme Court decided <u>Brasfield</u>. <u>See</u> <u>St. Louis & S.F.R.R. v. Bishard</u>, 147 F. 496 (8th Cir. 1906); <u>Stewart v. United States</u>, 300 F. 769, 782 (8th Cir. 1924).

In reviewing a claim that an <u>Allen</u> charge was impermissibly coercive, we examine four factors: (1) the content of the instruction, (2) the length of deliberation after the <u>Allen</u> charge, (3) the total length of deliberation, and (4) any indicia that the jury was coerced or pressured. <u>United States v. Thomas</u>, 946 F.2d 73, 76 (8th Cir. 1991). We note that the content of the district court's instruction was nearly identical, and substantively was identical, to that contained in § 10.02 of the Eighth Circuit Manual of Model Criminal Jury Instructions. In <u>Thomas</u>, we expressly approved the language of Model Instruction § 10.02. <u>Id.</u> at 76. At the time it received the charge, the jury had deliberated almost four hours and was deadlocked; we note that in <u>United States v. Cortez</u>, 935 F.2d 135, 142 (8th Cir. 1991), <u>cert. denied</u>, 502 U.S. 1062 (1992), we approved the giving of an <u>Allen</u>

instruction to a jury that had been deadlocked approximately four and one-half hours. Although the jury's return with a verdict approximately one hour after receiving the <u>Allen</u> charge is somewhat expeditious, we do not believe the postinstruction deliberation time, or the total deliberation time, in this case raises an inference of coercion. <u>See</u> <u>Thomas</u>, 946 F.2d at 76 (one and one-half hours postinstruction deliberation time and nine hours of total deliberation after a two-day trial did not raise an inference of coercion); <u>Cortez</u>, 935 F.2d at 142 (four and one-half hours postinstruction deliberation and nine hours total deliberation did not raise an inference of coercion). Finally, Warfield is unable to point to any record evidence of coercion or pressure on the jury. Considering these factors, we conclude that the giving of the <u>Allen</u> charge was not impermissibly coercive.

We also reject Warfield's claim that the <u>Allen</u> instruction should have been provided to the jury before it reached deadlock. Although we have indicated that it is preferable for the district court to include the substance of such a charge in its original instructions, before deadlock has occurred, <u>see</u> <u>Potter v. United States</u>, 691 F.2d 1275, 1277 (8th Cir. 1982), we have never held that to be the only permissible method of giving an <u>Allen</u> charge. In fact, <u>Allen</u> itself, like the overwhelming majority of cases we have encountered in which an <u>Allen</u> issue has been raised, dealt with the propriety of the instruction <u>after</u> deadlock occurred. <u>See, e.g.</u>, <u>Allen v. United States</u>, 164 U.S. 492, 501 (1896); <u>Thomas</u>, 946 F.2d at 76; <u>Cortez</u>, 935 F.2d at 140. Therefore, Warfield's argument that the district court should have given this instruction to the jury before deadlock, if it was to give the instruction at all, must be rejected.

In sum, we hold that the district court committed no error when it gave an <u>Allen</u> charge to the jury.

THOMAS'S APPEAL

A.

Thomas claims that the district court erred in preventing him from showing his bare feet to prosecution witness Yolanda Jones, and later to the jury. This claim stems from certain testimony Jones gave on cross-examination. Jones was a teller at Boatmen's Bank when the December 8, 1993, robbery occurred. After testifying on direct examination about the robber who jumped the teller counter during the robbery, Jones stated on cross-examination that she got a good look at the robber's feet and that one foot had a knot or protrusion that was observable, caused either by the robber's foot or by his boot. Although Jones initially testified that she would not be able to recognize the foot again if she saw it, she subsequently stated that she "[p]robably could" identify it if she saw it again. (Trial Tr. at 465.)

Thomas's counsel then requested that the court permit Thomas to show Jones his bare feet, ostensibly to illustrate that Thomas had no discernable abnormalities on either foot. The district court denied this request because Jones had not seen the robber's bare feet but only saw them with boots on. The district court suggested to Thomas's counsel that because Jones testified that she saw the robber's feet with boots on, it would be permissible to have Thomas put boots or shoes on and, with them on, display his feet to Jones. Thomas's counsel declined this suggestion.

Later, at the close of Thomas's case, Thomas's counsel requested that the court permit Thomas to show his bare feet to the jury, again basing this request on Jones's testimony regarding the protrusion on the robber's foot. The district court demurred, again on the basis that Jones had not seen the robber's bare foot, and thus the record evidence did not support such a demonstration.

-13-

Thomas claims that the district court erred by refusing to permit him to display his bare feet to Jones as well as to the jury. He argues that because identification was one of the crucial issues at trial, the court's rulings denied him his right to a fair trial.

We find Thomas's claim unpersuasive. We review the district court's rulings concerning the admission of evidence, including the admission of exhibits or the conducting of demonstrations, for an abuse of discretion. United States v. Woodfork, 955 F.2d 518, 519 (8th Cir. 1992). The issue raised here is almost identical to that we addressed in Woodfork. There the defendant was charged with bank robbery and was identified as the perpetrator of the crime by several bank employees. Id. at 518-19. At trial, the defendant requested permission to approach the jury and display a prominent gold front tooth because the bank employees had stated that they got a good look at the robber and did not notice anything conspicuous. Id. at 519. The district court rejected the defendant's request because it was possible that the defendant might not have opened his mouth sufficiently during the robbery to make the tooth discernible. Id. We held that the district court's ruling fell within the district court's ample discretion. Id.

Similarly, the district court's denial of Thomas's request to display his bare foot to Jones or the jury did not constitute an abuse of discretion. The court reasoned that Jones had testified that she saw a protrusion on the top of the robber's boot. Permitting Thomas to display his bare feet to either Jones or the jury would have created a condition that was without support in the record. Additionally, the district court attempted to accommodate

-14-

Thomas by permitting him to show Jones how his feet appeared with boots on, the condition that Jones testified she saw.[7]

Thus, the district court committed no abuse of discretion by refusing to permit Thomas to show his bare feet to Jones or the jury.[8]

B.

Thomas contends that the district court impermissibly restricted his cross-examination of government witness Jeffrey Hudspeth concerning the contents of Hudspeth's plea agreement. Hudspeth had been charged with, and pled guilty to, participating in the December 8 and December 17 robberies of Boatmen's Bank, and was cooperating with the government, having testified in front of the grand jury, in Terrance Davis's trial, and in the present trial. Hudspeth's plea agreement was admitted into evidence. The plea agreement referred to the requirements that Hudspeth provide assistance to the government concerning the bank robberies at issue, as well as provide assistance to other governmental entities concerning the prosecution of a drive-by double murder in Kansas City, Missouri. The district court granted the government's motion

---

[7]We find the case Thomas relies on, United States v. Bay, 748 F.2d 1344 (9th Cir. 1984) (subsequent case history omitted), readily distinguishable. There the defendant, who had been charged with bank robbery, had prominent tatoos on the back of his hands. Id. at 1345. A prosecution witness testified that she saw the robber's hands and stated the only noticeable feature of the hands was the defendant's long, thin fingers. Id. The Ninth Circuit held that the district court abused its discretion when it refused to permit the defendant to show his hands to the jury. Id. at 1346-47. Here, however, the district court was willing to permit Thomas to show his feet to Jones and the jury on the condition that he display them in the same condition as Jones testified that she saw the robber's feet, with boots on.

[8]We have also examined Thomas's confrontation clause claim and conclude that it is entirely without merit.

in limine that precluded Warfield and Thomas from questioning Hudspeth about the double murder case. The district court reasoned that information surrounding the double murder concerned a collateral matter and that it was potentially too prejudicial.[9]

Thomas complains that the district court's ruling impermissibly restricted his cross-examination of Hudspeth. He argues that he should have been permitted to question Hudspeth about the details of the double murder, so the jury could have received a complete account of the favorable treatment the government provided to Hudspeth as a result of Hudspeth's guilty plea and cooperation. By receiving this information, the jury would have been able to properly evaluate Hudspeth's biases and his potential for coloring his testimony in favor of the government. By failing to permit inquiry into this area, Hudspeth continues, the district court violated his Sixth Amendment right of confrontation. We disagree.

We have serious doubts that Thomas preserved this issue for appeal. A review of the transcript indicates that Warfield's counsel, not Thomas's counsel, strenuously argued in favor of permitting inquiry into this area and lodged a specific objection when the district court rejected Warfield's counsel's argument. At no time did Thomas make any argument, or more importantly, lodge any objection to the district court's denial of this request. Thomas has therefore waived this issue. See United States v. Brown, 33 F.3d 1014, 1017 (8th Cir. 1994) (failure of party to object to issue at trial precludes appellate review).

Even assuming that Thomas properly preserved this issue, we conclude that the district court properly denied Thomas the

---

[9]There is no dispute that Hudspeth was simply a bystander-witness to the drive-by shooting. It does not appear that he was ever a suspect in the commission of the crime.

opportunity to question Hudspeth about the Missouri state double murder case. It is true that "[t]he Confrontation Clause of the Sixth Amendment guarantees to a defendant the opportunity for effective cross-examination of witnesses against him, including inquiry into the witnesses' motivation and bias." United States v. Willis, 997 F.2d 407, 415 (8th Cir. 1993), cert. denied, 114 S. Ct. 704 (1994). The right to examine witnesses under this provision is not without limitation, however. District courts "`retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" United States v. Juvenile NB, 59 F.3d 771, 778 (8th Cir. 1995) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986)). A key factor in determining whether a defendant's right of confrontation has been violated is whether the defendant had other means at his disposal to obtain the effect that the excluded examination would have allegedly established. United States v. Campbell, 845 F.2d 782, 788 (8th Cir.), cert. denied, 488 U.S. 965 (1988). Absent a clear abuse of discretion and a showing of prejudice, we will not reverse a district court's ruling limiting cross-examination of a prosecution witness on the basis that it impermissibly infringed upon the defendant's right of confrontation. Willis, 997 F.2d at 415.

In this case, Thomas claims that he wished to question Hudspeth about the details of the Missouri murder case to show the extent of the benefits that Hudspeth received by pleading guilty and cooperating with the government. The district court committed no abuse of discretion in precluding Thomas from pursuing this line of questioning. Hudspeth was simply a witness to the double murders and, as part of his plea agreement, agreed to assist Missouri state authorities in the prosecution of that case. He was not charged in the murder case. The homicides were clearly

collateral matters in this case because Hudspeth, given that he was only a witness to the murders, would have had no reason to fabricate his testimony or to be biased for the government in this case.  Thus, inquiry into this area would have been of little, if any, benefit to Thomas, other than to portray Hudspeth as an individual who is around violent crimes.

On the other hand, Warfield's counsel was given ample opportunity to vigorously cross-examine Hudspeth in detail regarding the benefits Hudspeth received by pleading guilty to the robberies at issue in this case and cooperating with the government by providing testimony against his co-conspirators.  Counsel for Thomas and Warfield conducted a thorough cross-examination of Hudspeth, consuming almost 45 pages of trial transcript, about Hudspeth's bias and motive to lie, and his past criminal history. The Appellants also questioned Hudspeth at length about his testimony before the grand jury, at the Davis trial, and in the present trial.

Under these circumstances, we have little difficulty in concluding that the district court committed no abuse of discretion in precluding examination of Hudspeth concerning the Missouri state double murders that he witnessed.

C.

Thomas claims that the district court abused its discretion in admitting evidence of other crimes or bad acts that he committed. He claims that this evidence has no relevance to the offenses charged in this case because the other crimes and bad acts were simply unrelated collateral conduct.  He also argues that the probative value in admitting this evidence was substantially outweighed by its prejudicial impact.

The district court admitted the following items of bad acts evidence with which Thomas takes issue:  On June 1, 1993, Thomas was a passenger in a vehicle that was suspected as being the getaway vehicle for a robbery of a Pizza Hut store on May 28, 1993.  Thomas was questioned concerning the identity of the driver of the vehicle.  Several days later, after determining that Thomas had not been completely truthful with them, law enforcement officers questioned Thomas again, and he admitted he had previously lied to them about the identity of the driver of the vehicle.

On June 16, 1993, Thomas was stopped while driving a vehicle because of a traffic violation and because law enforcement officers believed that the perpetrator of the Pizza Hut robbery was riding with Thomas.  After the other individual was placed under arrest, Thomas consented to a search of the vehicle, during which officers discovered a handgun, ski mask, and a pair of brown work gloves in the glove compartment of the vehicle.  The day after this stop, Thomas was interviewed by officers and stated that the vehicle he had been driving the previous day was his, and he had exclusive use of it.  Several bank employees positively identified a photograph of the car as the vehicle that was used as a getaway car after the December 17, 1993, bank robbery.

Jason Hopkins, the evening manager of a Subway restaurant in Kansas City, testified that he was working on October 21, 1993, when the store was robbed.  He stated that the robbers wore stocking masks and heavy work gloves.  He stated that one of the robbers vaulted over the counter with a blue cloth bag and put the cash tray in the bag.  Hudspeth and Taylor testified that Thomas participated in this robbery, along with robberies of several other local fast-food establishments.

Thomas was picked up by law enforcement officers on August 2, 1994, for running a stop sign.  During a subsequent search of the

vehicle, officers discovered two loaded handguns, three nylon stocking masks, three pairs of gloves, a pillowcase, and a bandanna. Appellant Warfield was a passenger in the vehicle. A nylon stocking cap was recovered from Warfield's front pocket. The stop occurred within two blocks of two banks.

The admissibility of evidence of other bad acts is governed by Federal Rule of Evidence 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b). We have adopted a four-part test to determine whether other bad acts evidence is admissible under Rule 404(b). To be admissible, the evidence must be "(1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than in prejudicial effect; and (4) similar in kind and close in time to the crime charged." United States v. Shoffner, 71 F.3d 1429, 1432 (8th Cir. 1995) (internal quotations). Rule 404(b) is a rule of inclusion and precludes the admission of evidence which tends only to prove a defendant's criminal tendencies. Id. We review the district court's admission of other bad acts evidence for an abuse of discretion. United States v. Mejia-Uribe, 75 F.3d 395, 397 (8th Cir. 1996). However, "we will overturn the admission of Rule 404(b) evidence only if `the appellant can show that the evidence in question clearly had no bearing upon any of the issues involved.'" United States v. Baker, 82 F.3d 273, 276 (8th Cir. 1996) (quoting United States v. Street, 66 F.3d 969, 976 (8th Cir. 1995)).

"Evidence of prior crimes or bad acts is admissible to show a common plan or scheme, or intent." Baker, 82 F.3d at 276 (internal citations omitted). The plain terms of the rule also permit the introduction of such evidence if it is offered to show preparation. See Fed. R. Evid. 404(b). In this case, the evidence of other bad acts was relevant for one or several of these purposes. The evidence obtained as a result of the traffic stops on June 17, 1993, and August 2, 1994, during which Thomas possessed tools of the robber's trade, was relevant to show preparation to rob a bank and a common plan or scheme. This is because numerous witnesses from the two Boatmen's Bank robberies testified that the robbers wore stocking masks and work gloves. The evidence regarding the August 2 stop was particularly relevant to show preparation because the traffic stop occurred within a couple of blocks of two banks. The fact that the August 2 stop occurred after the robberies of the Boatmen's Bank at issue here is of no import. See United States v. DeAngelo, 13 F.3d 1228, 1231 (8th Cir.), cert. denied, 114 S. Ct. 2717 (1994). The evidence concerning the August 2 stop was also relevant because officers found a pillowcase in the vehicle, which related to the testimony from the Boatmen's Bank employees that the robbers removed the cash tray from the bank's drawer and put the tray in a cloth bag or pillowcase.

Similarly, the evidence from the Subway robbery was relevant to show a common pattern or scheme. The Subway manager testified that the robbers were wearing masks and gloves, which was the same attire worn by the Boatmen's Bank robbers. The witness also stated that one of the robbers vaulted over the counter, took the cash tray out of the register, and put the tray in a blue cloth bag. This was similar to the method by which the Boatmen's Bank robberies were carried out.

Finally, the evidence concerning the June 1, 1993, stop when Thomas was a passenger in the stopped vehicle, and Thomas's

subsequent admission that he had not been truthful with officers on June 1, were offered simply to provide a background regarding why the officers subsequently stopped him on June 17, 1993: They thought that the individual who had committed the Pizza Hut robberies was riding with Thomas. Given the relationship between the bad acts evidence and the issues in the case, we have no difficulty concluding that the evidence was relevant to a material issue in the case. We also note that pursuant to Thomas's counsel's request, the district court instructed the jury to disregard the witness Cooper's testimony about the Pizza Hut robbery and shooting. Tr. at 375.

We likewise find Thomas's claim that the evidence was unfairly prejudicial to be without merit. Federal Rule of Evidence 403 permits exclusion of evidence if the probative value of the evidence is substantially outweighed by its prejudicial effect. Fed. R. Evid. 403. The rule "is concerned only with unfair prejudice, that is, an undue tendency to suggest decision on an improper basis." United States v. Butler, 56 F.3d 941, 944 (8th Cir. 1995) (internal quotations omitted). The challenged evidence in this case does not suggest a decision on an inappropriate basis. As noted above, it simply was offered to show the conspirators' preparation and pattern, and the June 1, 1993, evidence was simply offered for background information. Additionally, the district court instructed the jury that the evidence of other bad acts was not to be considered to prove the acts charged. We have held that unfair prejudice is unlikely to be found where the district court instructed the jury that the bad acts evidence was not to be used as proof that the defendant committed the charged offense. See, e.g., Baker, 82 F.3d at 276; Butler, 56 F.3d at 944.

Therefore, the district court did not abuse its discretion in admitting evidence of prior bad acts Thomas committed.[10]

D.

Thomas claims that the district court violated his right to a fair trial by demonstrating judicial bias against him when the court made several comments in the presence of the jury. Thomas claims that these statements, combined with the court's refusal to permit him to show his feet to Jones or the jury, evince the district court's prejudice against him. He further argues that the district court's refusal to instruct the jury to disregard the court's bias against him left the prejudicial impact of the court's statements uncured.

"We have always been reluctant to disturb a judgment of conviction by reason of a few isolated, allegedly prejudicial comments of a trial judge, particularly in a long trial." United States v. Evans, 30 F.3d 1015, 1018 (8th Cir. 1994) (internal quotations and citation omitted), cert. denied, 115 S. Ct. 1383 (1995). We will, however, reverse the conviction if the court's comments throughout a trial are one-sided and interfere with a defendant's case to such an extent that the defendant is deprived of the right to a fair trial. Id.

---

[10]We reject as completely unfounded Thomas's assertion that he failed to receive adequate notice that the government intended to introduce this Rule 404(b) evidence as required by that rule. See Fed. R. Evid. 404(b) (requiring reasonable notice of intent to use evidence under that provision). A cursory review of the record indicates that Thomas's counsel was informed well in advance of trial that the government intended to use this evidence. See (Gov't's Addend. at 3.) (outlining over two weeks in advance of trial government's intention to introduce evidence of June 16, 1993, and August 2, 1994, traffic stops, and evidence relating to robbery of Subway restaurant).

-23-

Thomas's evidence falls far short of this mark.  For the reasons discussed above, we reject Thomas's claim that the court's refusal to permit him to show his feet to Jones or to the jury was erroneous.  The district court's comments which Thomas claims show bias, many of which Thomas selectively quotes without providing the context in which the comment was made, relate primarily to the efficient, orderly presentation of evidence and the examination of witnesses.  For instance, in one incident Thomas points to as supportive of his claim of judicial bias, the district court asked Thomas's counsel whether counsel was almost through with the questioning and presentation of a bank surveillance tape, to which counsel indicated that he was.  When counsel continued asking questions regarding the tape and then experienced difficulty in locating the frame he desired, the district court stated that "[w]e really have to get going with this . . .," and, after counsel could not locate the desired frame, the court dismissed the jury for its morning recess.  (Trial Tr. at 224-25.)  On another occasion, the district court ordered Thomas's counsel to refrain from arguing with a prosecution witness after counsel had asked repetitive questions concerning the witness's reluctance to speak with counsel.[11]  These statements simply relate to the conduct of a criminal trial, for which the district court possesses broad discretion.  <u>United States v. Frayer</u>, 9 F.3d 1367, 1374 (8th Cir. 1993), <u>cert. denied sub nom. Haney v. United States</u>, 115 S. Ct. 77 (1994).

---

[11]In another incident, Thomas objected to the prosecution's questions on one ground and the district court informed the prosecution that the whole line of questioning was improper based on a different reason that the court itself raised.  Thomas claims that by failing to adopt his basis for excluding the questions and instead relying upon the court's reasoning, the district court was attempting to ridicule counsel.  After reviewing the record, we must disagree and note that the prosecution, rather than Thomas's counsel, was the recipient of the court's criticism.

The district court did on several occasions admonish Thomas's counsel to cease a line of questioning, and at one point characterized a question posed by Thomas's counsel as "misleading." (Trial Tr. at 358.) Again, however, for the most part the court's comments related to the orderly administration of the trial and the few, isolated comments that Thomas points to were not improper when read in context. Finally, the trial in this case was somewhat lengthy, consuming over 850 pages of trial transcript. Given the paucity of judicial statements about which Thomas complains, compared to the length of the trial, any prejudice which might have accrued did not deprive Thomas of his right to a fair trial. Accordingly, the district court's comments reflected no judicial bias and the court committed no error in refusing to instruct the jury to disregard the court's comments.

E.

Finally, Thomas claims that the prosecutor committed prosecutorial misconduct during closing arguments. He claims that the prosecutor made misstatements of the facts in a manner calculated to mislead the jury regarding the highly contested issue of identification, and the trial court took no action. We evaluate claims of prosecutorial misconduct under a two-part test. First, we ask whether the prosecutor's comments were in fact improper, and second, if they were, we look to whether the remarks prejudiced the defendant's right to a fair trial. United States v. Karam, 37 F.3d 1280, 1289 (8th Cir. 1994), cert. denied sub nom. El Hani v. United States, 115 S. Ct. 1113 (1995). "Prosecutors, however, are entitled to argue reasonably inferences to be drawn from the facts in evidence during closing argument." Id. We review a district court's failure to grant a mistrial for prosecutorial misconduct and the court's failure to give the jury a cautionary instruction for an abuse of discretion. United States v. Crockett, 49 F.3d 1357, 1362 (8th Cir. 1995).

At trial, Thomas vigorously contested the issue of identification. To that end, he focused on testimony from various Boatmen's Bank employees who testified that the robber was 5'7" to 5'8", along with a police video dispatch transcript reporting that the robber was 5' to 5'6", and contrasted that with his evidence that he is 5'11". Thomas specifically called Boatmen's Bank employee Kent Stiles, who testified that he was in the bank at the time of the December 8, 1993, robbery. Stiles stated on direct exam that the two robbers "were just of average height," which he stated to the police in a statement after the robbery to be approximately 5'8". (Trial Tr. at 511.) On cross-examination by the government, Stiles stated that he told the police that the robbers were approximately 5'8" because the robbers "didn't seem to be abnormally short or tall. So, you know, I probably define average in terms of myself." (Id. at 512.) Stiles stated that it was possible that, given his definition of "average height," the robbers could have been as tall as he is, and he stated that he is 6'.

During closing argument, Thomas's counsel focused on the discrepancy between the items of evidence illustrating that the robbers were 5'8" or shorter and Thomas's height of 5'11". During the government's rebuttal, the following took place:

> MR. NEWBERT (prosecutor): And you remember Mr. Collum mentioned all these tellers. He didn't mention Kent Stiles. He brought Kent Stiles in. He is a bank employee. What did he tell you about that December 8th bank robbery? He said he was six feet tall. He said the robber, he described the robber --
>
> MR. CULLOM (Thomas's counsel): I object to this statement.
>
> THE COURT: The jury will remember the evidence and will be guided by the evidence.

        MR. NEWBERT:  -- as average height and he considered
        himself a six footer as average height.  He mentioned
        that.

(Trial Tr. at 941.)  The prosecutor then continued with his rebuttal argument.

Thomas claims that the prosecutor's statement was false and that the district court should have declared a mistrial, or in the alternative, at least admonished the jury to disregard the statement.  We disagree.  A fair review of Stiles' testimony clearly indicates nothing improper about the prosecutor's rebuttal argument.  When the prosecutor's statements are read in their entirety, it is clear that the prosecutor was simply pointing out that Stiles had testified that the robbers could be as tall as 6'.  In short, the prosecutor was simply arguing an inference that could reasonably be drawn from the testimony of a witness.

Thus, the prosecutor did not make any improper statement that prejudiced Thomas's right to a fair trial.  A fortiori, the district court committed no error in failing to sustain Thomas's general objection, and there was no reason to admonish the jury to disregard the prosecutor's comments.

III.

For the reasons enumerated above, we affirm the judgments of the district court.

A true copy.

        Attest:

                CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-27-

I will tell you, as stated in my instructions, it is your duty to consult with one another and to deliberate with a view to reaching agreement if you can do so without violence to your individual judgment. Of course you must not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinions of other jurors or for the mere purpose of returning a verdict. Each of you must decide the case for yourself; but you should do so only after consideration of the evidence with your fellow jurors.

In the course of your deliberations you should not hesitate to re-examine your views and to change your opinion if you are convinced it is wrong. To bring twelve minds to a unanimous result you must examine the questions submitted to you openly and frankly, with proper regard for the opinions of others and with a willingness to re-examine your own views.

Remember that if in your individual judgment the evidence fails to establish guilt beyond a reasonable doubt, then the defendant should have your vote for a not guilty verdict. If all of you reach the same conclusion, then the verdict of the jury must be not guilty. Of course the opposite also applies. If in your individual judgment the evidence establishes guilt beyond a reasonable doubt, then your vote should be for a verdict of guilty and if all of you reach that conclusion then the verdict of the jury must be guilty. As I instructed you earlier, the burden is upon the government to prove beyond a reasonable doubt every essential element of the crimes charged.

Finally, remember that you are not partisans; you are judges -- judges of the facts. Your sole interest is to seek the truth from the evidence. You are the judges of the credibility of the witnesses and the weight of the evidence.

You may conduct your deliberations as you choose. But I suggest that you carefully reconsider all the evidence bearing upon the questions before you. You may take all the time that you feel is necessary.

There is no reason to think that another trial of this case would be tried in a better way or that a more conscientious, impartial or competent jury would be selected to hear it. Any future jury must be selected in the same manner and from the same source as you. If you should fail to agree on a verdict, the case is left open and must be disposed of at some later time.

Please go back now and finish your deliberations in a manner consistent with your good judgment as reasonable persons.

You are excused.

(Trial Tr. at 954-57.)