# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1845

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Toby Bolzer, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted:  December 16, 2003

Filed:   May 20, 2004

_____

Before WOLLMAN, JOHN R. GIBSON, and RILEY, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Toby Bolzer was convicted of second-degree murder and use of a firearm during the commission of a crime of violence in violation of 18 U.S.C. §§ 1111, 1153 and 924(c). He was sentenced to 168 months imprisonment on the murder count, 120 months consecutively on the firearm count, three years supervised release, restitution of $4,326.44 and special assessments of $200. He argues on appeal that the district court erred in: 1) denying his motion for acquittal based on the alleged failure of the government to meet its burden with respect to all elements of second-degree murder; 2) giving an erroneous jury instruction on malice aforethought; 3) failing to grant a mistrial based on prosecutorial misconduct; 4) refusing to allow extrinsic proof of a

prior inconsistent statement by a government witness; and 5) giving an erroneous jury instruction regarding his allegedly false exculpatory statements. We affirm.

I.

At the time of her death, Santana Standing Bear lived in a house on the Pine Ridge Indian Reservation with Holly Quinn, Quinn's four year-old daughter, Tyra, and the defendant, Toby Bolzer. Quinn and Santana, both female, were in a romantic relationship and had begun living together sometime in 2000. Bolzer moved in during the fall of 2001. He knew Quinn from when they worked together for the Oglala Sioux Tribal Police and had romantic feelings toward her. Quinn told Bolzer that she was not interested in a romantic relationship with him, but nonetheless allowed him to live in her home because Bolzer was unemployed and had previously helped her.

The government presented evidence that the relationship between Santana and Bolzer was friendly at first but quickly deteriorated. Quinn testified that Bolzer and Santana were jealous people and that problems developed between the two once Bolzer learned the romantic nature of Santana's relationship with Quinn. She said Bolzer and Santana rarely spoke to each other and often complained about one another to Quinn. On February 16, 2002, Quinn told Bolzer that "if he couldn't handle the situation with [Quinn and Santana] being together, then he could leave." According to Quinn, Bolzer responded by yelling, "I hate her, I hate her." Neither he nor Santana left the household.

Several witnesses provided testimony about Santana's mental and emotional problems. There was testimony that Santana had been the victim of an attempted rape, had been emotionally and physically abused by her mother, had suffered sexual abuse by her relatives, and had threatened or attempted to harm herself or commit

suicide on several occasions. She spent a significant amount of time in treatment centers attempting to deal with these problems.

Santana's death occurred on the night of February 20, 2002. With the exception of the few moments immediately preceding her death, the events of that night are undisputed. The four members of the household spent the early evening hours watching a movie with Quinn's eight year-old niece, Clara Poor Bear. When the movie ended, Bolzer offered to drive Clara home. Santana and Quinn began to argue while he was gone, and Quinn called Santana a "psycho." This comment caused Santana to become very upset. She took Quinn's gun, which Quinn possessed in connection with her employment by the Oglala Sioux Tribal Police, and refused to relinquish it. Quinn continued arguing with Santana and told her at one point, "This is it. This is fucking it," which Quinn later explained meant that she considered their relationship to be over. Santana eventually moved from the kitchen, where the argument had started, to her bedroom. She kept the gun with her.

Bolzer returned when the two women were still in the kitchen arguing and entered the house as Santana was walking toward her bedroom. Bolzer took Tyra into the kitchen and attempted to comfort her while Quinn followed Santana to her bedroom. Quinn heard Santana on the phone with a friend and took a step into the bedroom. Santana pointed the weapon at Quinn and told her, "Don't come any closer." Quinn backed out of the room and watched as Santana turned the gun and pointed it at her own chest. Quinn returned to the kitchen for ten seconds, then walked back to Santana's bedroom. Santana was still holding the weapon to her chest and was trying to call her mother.

Quinn returned to the kitchen again. She helped Bolzer get Tyra ready so that Bolzer could take Tyra out of the house. After Bolzer and Tyra left the house, Quinn put on her bullet-proof police vest and returned a third time to Santana's bedroom. She heard Santana on the phone to Carla Jean Standing Bear ("C.J."), saying, "C.J.,

I don't know what to do. I am going to kill myself." Quinn panicked, left the police vest in her bedroom, and ran out of the house to Bolzer's truck, where Bolzer and Tyra were sitting. Quinn told Bolzer, "She's going to do it, she's going to do it." She then asked Bolzer, "Shall I go in, or are you going to go in?" He responded, "I will."

As Bolzer proceeded toward the house, Quinn told him her vest was in her bedroom and that he should also use her mace. After Bolzer entered the house, Quinn sat in the pickup for one or two minutes and then drove off with Tyra to her cousin's home. Quinn hoped to bring her cousin back to Quinn's house because she thought her cousin could calm Santana down.

The events of the next few moments are disputed. Bolzer testified that he entered the house, found Quinn's mace, and put on Quinn's police vest. He said that Santana's door was locked when he reached it but that he could hear her crying and talking on the phone. He sprayed mace under the door, then went to the kitchen to find a knife that he could use to pry the door open. He found a knife, opened the door, took a step into the room and told her, "Give me the gun; give me the gun." He testified that he approached her and sprayed mace at her, and she turned away. He testified that he took another step and reached down for the gun when a shot was fired–either accidentally or because Santana intentionally pulled the trigger–into Santana's chest.

The government presented evidence that the shooting was neither accidental nor a suicide. The government's primary evidence was Bolzer's own confession, which he made to FBI agents on March 7, 2002, approximately two weeks after Santana's death. FBI Special Agent Joe Weir testified that he and two other agents had Bolzer reenact the events surrounding Santana's death, and that the reenactment led to Bolzer admitting to "grabbing the gun, pulling it back, raising it up, and then pulling the trigger one round" into Santana's chest. Weir testified that Bolzer admitted he shot Santana because the events of the night presented an opportunity to

"get her out of the way." Weir also testified that Bolzer acknowledged having lied to law enforcement by portraying the incident as a suicide.

The government also relied on testimony from Carla Standing Bear, who said that she was on the telephone with Santana when Bolzer entered the bedroom on the night of the shooting. Carla Standing Bear testified that she heard Bolzer say, "Santana, you bitch." She testified that Santana told her Toby had a gun and that she needed help.

## II.

Bolzer challenges the sufficiency of the evidence supporting his conviction for second-degree murder. He argues that even if the jury concluded he shot Santana, the evidence surrounding the shooting–particularly the evidence of Santana's emotional instability–is uncontradicted and shows the existence of extenuating circumstances. These extenuating circumstances, he argues, negate any finding of malice aforethought, which is a necessary element of second-degree murder. Instead, he asserts that the facts support only a finding of voluntary manslaughter. The district court denied his motion for judgment of acquittal both at the end of the government's case and at the close of the trial.

"We review the denial of a motion for acquittal by viewing the evidence in the light most favorable to the verdict, giving the government the benefit of all reasonable inferences to be drawn from the evidence." United States v. Davis, 103 F.3d 660, 667 (8th Cir. 1996).[1] We will uphold the conviction against a challenge to

---

[1]Bolzer also argues that Davis is applicable for its proposition that "[w]here the government's evidence is equally strong to infer innocence as to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal." 103 F.3d at 667. Bolzer acknowledges that subsequent cases, including United States v. Butler, 238 F.3d 1001, 1004 (8th Cir. 2001), have suggested that Davis conflicts with United States v. Baker, 98 F.3d 330, 338 (8th Cir. 1996) ("If the evidence rationally

the sufficiency of the evidence unless "a reasonable fact-finder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements." United States v. Teitloff, 55 F.3d 391, 393 (8th Cir. 1995).

Bolzer rests his argument on DeMarrias v. United States, 453 F.2d 211 (8th Cir. 1972), in which the appellant appealed his conviction for second-degree murder on the ground that there was insufficient evidence of malice aforethought. The appellant in DeMarrias had admitted in conversations with third-parties to having killed the victim but made no further comment about his subjective motivation at the time of the homicide. Id. at 214. The three statements he made were: 1) "Keep still or I will hit you, too" (made to another occupant of the home where the incident occurred); 2) "I hope Jerry isn't dead. If he is, I have to go back to Sandstone, Minnesota, prison"; and 3) "I killed my brother. I killed my brother." Id. The government argued that evidence of collateral circumstances tended to prove malice, including evidence that the victim had been found lying in a bed and that the appellant had assaulted two other persons during the night of the homicide and had threatened a third. We held that neither the appellant's statements nor this collateral evidence supported an inference of malice because the government failed to establish the time of the homicide and therefore failed to connect the circumstantial evidence to the time of the homicide. Id. We set the conviction aside and remanded with instructions to resentence the appellant on a voluntary manslaughter charge. Id. at 215.

---

supports two conflicting hypotheses, the reviewing court will not disturb the conviction."), but argues that we should follow Davis. We believe that Davis and Baker are reconcilable. See United States v. Flores, 362 F.3d 1030, 1035 n.1 (8th Cir. 2004) (observing that Davis referred only to the *government's* evidence, while Baker referred to *all* the evidence, including that presented by the defense). In any event, we are not persuaded that the government's evidence in this case is equally strong to infer innocence as to infer guilt.

Unlike the evidence in <u>DeMarrias</u>, Bolzer's confession and the government's other evidence provides sufficient insight into his state of mind at the time of the shooting to permit the jury to infer that he acted with malice aforethought. In particular, Agent Weir testified that Bolzer admitted to having built up frustrations with Santana and to seeing the events of the night of February 20 as an opportunity to "get her out of the way." Moreover, the jury heard Carla Standing Bear testify that she heard Bolzer call Santana a "bitch" immediately before the shooting, and that Santana said Bolzer had a gun and pleaded for help. A reasonable juror, relying on this evidence alone, could reasonably have concluded that Bolzer intended at the time of the killing "willfully to take the a life of a human being or . . . willfully to act in callous and wanton disregard of the consequence of human life." <u>United States v. Johnson</u>, 879 F.2d 331, 334 (8th Cir. 1989).

The evidence of Santana's emotional problems on the night of the shooting does not convince us otherwise. It is certainly possible that her problems affected Bolzer to such an extent that he did not act with malice aforethought, but reaching this conclusion would require us to give *him* the benefit of all reasonable inferences that may be drawn from the evidence. This we clearly cannot do. <u>See</u> <u>Teitloff</u>, 55 F.3d at 393. Instead, viewing the evidence in the light most favorable to the *government*, it is reasonable to infer from the evidence that Bolzer saw her instability as an opportunity to get rid of her and therefore possessed the necessary malice aforethought. The jury apparently concluded as much, and we will not disturb their verdict.

### III.

Contrary to Bolzer's assertion, we also conclude that the district court did not commit plain error in its jury instruction on malice aforethought. Bolzer did not object below to the malice instruction, nor did he request a voluntary manslaughter instruction, but now argues that the instruction erroneously informed the jury that it

needed only to find that Bolzer acted intentionally in order to find that he acted with malice. The district court's instruction on malice aforethought followed almost verbatim the language of a malice instruction that we described as "proper" in Johnson, 879 F.2d at 334, and therefore is not plainly erroneous.

IV.

Bolzer next argues that the district court abused its discretion in denying his motion for a mistrial based on alleged prosecutorial misconduct. The government's opening statement twice suggested that Bolzer had destroyed evidence immediately after the shooting. The government made several other suggestions during the trial that evidence was destroyed, including the presentation of testimony that Bolzer had attended a law enforcement training course where lessons were given on how easy it is to destroy evidence. Bolzer contends that no affirmative evidence was ever presented that he had actually destroyed any evidence at the scene, and therefore the opening statement and other allusions to the destruction of evidence constituted misconduct.

We conclude that the district court did not abuse its discretion in denying Bolzer's motion for a mistrial. See United States v. Warfield, 97 F.3d 1014, 1028 (8th Cir. 1996) (applying abuse of discretion review).[2] The reference to destruction of

---

[2]The government appears to argue that our review should be for plain error because Bolzer failed to object at the time the alleged misconduct occurred. We are unpersuaded. Bolzer could not possibly have known upon hearing the government's opening statement, or upon hearing the early parts of the government's case, that the government would ultimately fail to substantiate its claims. Because Bolzer moved for mistrial on the basis of prosecutorial misconduct at the end of the government's case, the district court had an adequate opportunity to consider his motion, and we will review the denial of that motion for abuse of discretion. See United States v. Novak, 918 F.2d 107, 109-10 (10th Cir. 1990) (defendant's motion for mistrial at the end of the government's case was sufficient to preserve claim of prosecutorial

evidence in the government's opening statement was a permissible inference that could be drawn from the evidence the government ultimately produced in the case. See United States v. Wilkinson, 754 F.2d 1427, 1435 (2d Cir. 1985) (affirming district court's denial of new trial motion based on prosecutorial misconduct where the statements objected to "did not go beyond inferences that might normally be drawn from the evidence"); see also United States v. Perry, 925 F.2d 1077, 1081 (8th Cir. 1991) (holding that prosecutor's opening statement was not improper where it referred to a witness who ultimately did not testify and thereby forced the jury to draw an inference from circumstantial evidence). It is undisputed, for example, that after the shot was fired Bolzer moved the gun from Santana's bedroom to the kitchen and unloaded it. Nonetheless, his fingerprints were not found on the gun. In light of his subsequent confession, the government certainly could argue the inference that he wiped down the weapon in an effort to conceal his guilt. Likewise, the government presented testimony that the gun was "[w]ithin a couple inches" from Santana's chest at the time of the shooting, and that the bullet hit most of her vital organs, including the heart, lung, stomach, and diaphragm. Nonetheless, there was no evidence of "blowback"–described by a government witness as fragments of the victim's skin or blood that may end up on a firearm–found on the gun. Again, a permissible inference is that Bolzer destroyed evidence of blowback by wiping down the gun. Bolzer's counsel was free to–and did–argue the weakness of such an inference. See Perry, 925 F.2d at 1081 (observing that the defendant was free to cross-examine witnesses and put on his own evidence to show the weakness of the inferences urged by the prosecutor).

V.

Bolzer next argues that the district court erred under Rule 613(b) of the Federal Rules of Evidence in excluding evidence of an alleged prior inconsistent statement by FBI Agent Weir. Weir testified on direct examination that he transferred from the FBI office in Pierre, South Dakota, to the office in Sioux Falls, South Dakota,

misconduct for appeal).

because his "wife is from Des Moines originally and she wanted to be closer to shopping." Bolzer contends that the true reason for Weir's transfer was because of his problematic relationship with a federal judge there, which culminated with Weir using profanity to describe the judge during a conversation with a court employee. On cross-examination, Weir admitted that there had been an inquiry into his conduct but denied having used profanity. Bolzer later attempted to have the court employee, Kathy Hammond, testify for the purpose of impeaching Weir, but the district court refused to allow it under either Rule 608 or Rule 613(b). Bolzer was allowed to present Hammond's testimony in an offer of proof outside the presence of the jury and now appeals the district court's exclusion of this evidence. He limits his appeal to admissibility under Rule 613(b).

We review the district court's evidentiary rulings under Rule 613(b) for an abuse of discretion. See United States v. Roulette, 75 F.3d 418, 423 (8th Cir. 1996).[3] Under Rule 613(b), "[a] party may introduce extrinsic evidence of a witness's prior inconsistent statements if the witness is given a chance to explain the inconsistency, the opposing party is afforded an opportunity to question the witness about the inconsistency, and the inconsistent statements are material to the substantive issues at trial." United States v. Miller, 91 F.3d 1160, 1163 (8th Cir. 1996).

The government attempts to justify the exclusion of Hammond's impeachment testimony by citing several cases dealing with the exclusion of evidence under Rule 608(b). That rule, in relevant part, states: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness. . . may not be proved by extrinsic evidence." Fed. R. Evid. 608(b). The

_____

[3]Bolzer cites a Fifth Circuit case, United States v. Davis, 639 F.2d 239, 244 (5th Cir. 1981), for the proposition that our review is less deferential when the Sixth Amendment is implicated. We do not read Davis as having any relevance to the standard of review; instead, Davis merely recognizes that the Federal Rules of Evidence do not limit a defendant's Sixth Amendment right to compulsory process. Id.

government's reliance on this rule is misplaced. Rule 608 and Rule 613 are independent bases for the admission of evidence and are governed by different principles. Rule 608(b) applies when a party attempts to introduce evidence of prior conduct of a witness that standing alone tends to attack or support the witness's general character for truthfulness. See, e.g., United States v. James, 609 F.2d 36, 46 (2d Cir. 1979) ("[Rule 608(b)] was intended to regulate only the use of specific instances of conduct to prove that the witness is a 'bad person' or is a generally untruthful person who should not be believed."). In this sense, Bolzer clearly could not introduce the court employee's testimony for the purpose of establishing that Weir is generally a dishonest person or that he has a character for untruthfulness. By contrast, Rule 613(b) addresses situations where a witness makes two irreconcilable statements, one at trial and one previously. See United States v. Winchenbach, 197 F.3d 548, 558 (1st Cir. 1999) ("In short, comparison and contradiction are the hallmarks of Rule 613(b)."). A party may introduce evidence of the prior inconsistent statement under this rule for the purpose of calling the witness's credibility into question, see id.; however, the subject of the prior inconsistent statement must be material. Miller, 91 F.3d at 1163; Roulette, 75 F.3d at 423.

The materiality requirement gives rise to Bolzer's own apparent confusion about the difference between Rule 608 and Rule 613(b). Bolzer insists that his appeal is based on Rule 613(b); however, when pressed to explain the materiality of the court employee's testimony, he argues that it is material because it would call Weir's credibility into question by refuting Weir's claim of always acting courteously and professionally. This appears to us as an attack on Weir's general character, which is the focus of Rule 608. Moreover, even if Weir's credibility could constitute a material issue for purposes of Rule 613(b), the Rule 613(b) test is nonetheless not satisfied in this instance because Weir's credibility was not the subject of the prior inconsistent statement. The relevant issue under Rule 613(b) is not whether there is some material issue that would be affected in some way by the admission of the prior inconsistent testimony, but rather whether the *precise subject* of the prior inconsistent

-11-

testimony is material.  See Roulette, 75 F.3d at 423 ("A prior inconsistent statement contains collateral matter and is therefore inadmissible if the facts referred to in the statement could not be shown in evidence for any purpose independent of the contradiction.").  Weir's alleged comment about the federal judge to the court employee in Pierre, however ill-advised and inappropriate, had no substantive connection whatsoever to Bolzer's second-degree murder trial.  Thus, any tendency of that prior statement to call Weir's credibility into question is irrelevant for Rule 613(b) purposes.

For these reasons, the district court did not abuse its discretion in refusing to admit the impeachment testimony proffered by Bolzer.  See United States v. Grooms, 978 F.2d 425, 428-29 (8th Cir. 1992) (district court did not abuse its discretion in excluding evidence that abuse victims' mother told a friend she believed the victims' father had coached their testimony where the substance of the statement was not material).

## VI.

Bolzer's final argument is that the district court abused its discretion by giving an improper jury instruction regarding Bolzer's consciousness of guilt.  See United States v. Lalley, 257 F.3d 751, 755 (reviewing jury instructions for abuse of discretion).  The district court instructed:

> When a defendant voluntarily and intentionally offers an explanation or makes some statement tending to show his innocence, and this explanation or statement is later shown . . . to be false, the jury may consider whether the circumstantial evidence points to a consciousness of guilt. Ordinarily, it is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish his innocence.

> Whether or not evidence as to defendant's voluntary explanation or statement points to a consciousness of guilt and the significance to be attached to any such evidence, are matters exclusively within the province of the jury.

Bolzer argues that the instruction failed to make clear that it applied only to his pretrial statements; thus, it allowed the jury to use his trial testimony when evaluating consciousness of guilt. He further argues that the instruction implied that his pretrial statements were false when truth or falsity was an issue the jury was required to decide before using the statements as evidence of consciousness of guilt.

We conclude that any error in the district court's failure to distinguish between pretrial statements and trial testimony is harmless. See United States v. Wright, 246 F.3d 1123, 1128 (8th Cir. 2001) (reversal is warranted for improper jury instructions only where "the error affected the defendant's substantial rights"). We share Bolzer's concern with the district court's failure to clarify that the instruction applied only to his pretrial statements. See United States v. Clark, 45 F.3d 1247, 1251 (8th Cir. 1995) ("The false exculpatory statement instruction is aimed at pretrial fabrications, on the theory that the innocent do not fabricate to avoid being accused of crime. That theory does not apply to a defendant's trial testimony.") (internal citation omitted). Nonetheless, Bolzer admits that the statement of innocence he made to an investigator on the night of Santana's death–which was one of the voluntary and intentional pretrial statements referred to in the jury instruction–was "an almost exact version of events which Bolzer eventually testified to at trial." Thus, the jury could not have found Bolzer's trial testimony to be false without also concluding that this pretrial statement was false. If the jury actually did, as Bolzer fears, use the disbelieved trial testimony as evidence of consciousness of guilt, then surely it used or would have used the disbelieved pretrial statement for the same purpose.

Similarly, even if one part of the jury instruction implied that Bolzer's statements were false, the district court did not abuse its discretion in giving that

-13-

instruction.  Immediately after giving the instruction to which Bolzer complains, the court instructed: "If you find that Santana Standing Bear intentionally took her own life, or that either Santana Standing Bear or Toby Bolzer accidentally caused the gun to discharge, then you must find the defendant not guilty on both counts of the indictment."  This instruction informed the jury that it needed to determine the veracity of Bolzer's claim that the gun went off accidentally or by Santana's own actions.  Furthermore, the court later stated: "Nothing I have said or done is intended to suggest what your verdict should be.  That is entirely for you to decide."  Again, this instruction illustrated to the jury that it must reach a verdict on its own and that any suggestions of guilt or innocence contained in the instructions were inadvertent.  See, e.g., United States v. Lalley, 257 F.3d 751 (8th Cir. 2001) (holding that district court did not abuse its discretion in giving jury instructions that, "taken together. . . fairly and adequately conveyed the issues to the jury").

## VII.

For the reasons stated above, we affirm Bolzer's convictions.

_____

-14-