# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1202

_____

United States of America,

        Appellee,

v.

Bernard J. Drapeau, Jr.,

        Appellant.

\* \* \* \* \* \* \* \* \* \*

Appeal from the United States
District Court for the
District of South Dakota.

_____

Submitted: October 19, 2004
Filed: July 12, 2005

_____

Before COLLOTON, LAY, and GRUENDER, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Bernard J. Drapeau, Jr., appeals his conviction for distributing a controlled substance and possessing a controlled substance with the intent to distribute, and his sentence of 324 months' imprisonment and three years' supervised release. We affirm Drapeau's conviction, but vacate his sentence and remand for resentencing in light of *United States v. Booker*, 125 S. Ct. 738 (2005).

# I.

Drapeau was convicted based on information the Northern Plains Safe Trail Drug Enforcement Task Force ("Task Force") gathered from a controlled drug transaction in Fort Thompson, South Dakota. The transaction was carried out on April 20, 2002, by a confidential informant, Kristy Big Eagle, working with three Task Force agents. Big Eagle made a recording of the transaction with a hidden audio microphone provided by the agents.

On November 13, 2002, Drapeau was indicted on two drug counts: distribution of a controlled substance and possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Task Force agents arrested Drapeau in Fort Thompson on November 15, and promptly advised him of his *Miranda* rights. Drapeau at first stated that he did not want to talk to the agents. The agents then transported Drapeau to Hughes County Jail in Pierre, about sixty miles away. During the trip from Fort Thompson to Pierre, Drapeau admitted using and distributing methamphetamine. The following day, November 16, Drapeau gave agents a more detailed history of his involvement in drug trafficking, naming other persons from whom he had purchased drugs and specifying the quantities purchased. He also admitted selling methamphetamine to Big Eagle on six occasions.

At Drapeau's trial on April 1 and 2, 2003, Big Eagle and three Task Force agents gave testimony. Big Eagle testified that she purchased methamphetamine from Drapeau during the controlled transaction, and the jury heard the audio tape of the episode. One of the agents recounted Drapeau's admission on November 16 that he had sold drugs to Big Eagle on six occasions. The jury found Drapeau guilty on both counts.

Drapeau was sentenced on January 12, 2004. Although the jury was required to find only that Drapeau distributed and possessed with intent to distribute a

"detectable amount" of drugs, the court determined that Drapeau was responsible for 1.721 kilograms of methamphetamine and that his base offense level was 34. (S. Tr. 34). The court applied a two-level adjustment for possession of a dangerous weapon, USSG § 2D1.1(b), (*id.* at 35), which resulted in a total offense level of 36. After finding that Drapeau's criminal history category was VI, the court sentenced Drapeau at the low end of the applicable sentence range of 324 to 405 months' imprisonment.

A.

Drapeau advances four arguments why his conviction should be reversed. First, he contends that the district court erred in denying his motion to suppress statements he made to Task Force agents following his arrest. The district court denied Drapeau's motion to suppress his statements, adopting the report and recommendation of the magistrate judge who conducted a hearing on the motion. We review the district court's findings of fact for clear error and the legal conclusions *de novo*. *United States v. Thorn*, 375 F.3d 679, 683 (8th Cir. 2004).

Drapeau argues that his statements were obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), because they were a product of the arresting agents' failure to honor scrupulously his "right to cut off questioning." *See Michigan v. Mosley*, 423 U.S. 96, 104 (1975); *United States v. Thompson*, 866 F.2d 268, 271 (8th Cir. 1989). In *Mosley*, the Supreme Court clarified that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Mosley*, 423 U.S. at 100 (quoting *Miranda*, 384 U.S. at 473-74). The *Mosley* analysis applies once a suspect in custody has "effectively asserted his right to remain silent." *Thompson*, 866 F.2d at 270.

We believe this case is comparable to *Thompson*, where the suspect initially told interrogating agents that he would "sleep on it" and would talk "tomorrow," but

later volunteered that he wanted to "wait a little while before I'm interviewed." Thompson then signed a waiver of rights form and answered questions. We held that even assuming Thompson's initial statement was a request to defer questioning until "tomorrow," his initial decision to remain silent was reversed by his later volunteered statements. Therefore, Thompson had not "effectively asserted" his right to remain silent, and *Mosley* did not apply.

In this case, the district court found that after agents advised Drapeau of his *Miranda* rights, Drapeau responded by saying he "did not want to talk to agents at that time." (Tr. of Bench Dec. at 6). Shortly thereafter, however, Drapeau "initiated a conversation with agents" during the car ride to Pierre. (*Id.*) The conversation began as a general one, touching on hunting, fishing, children, and Fort Thompson. Drapeau then "brought up the facts that his parents were ill," and "that he did not want to go to prison" and "expressed a willingness to cooperate and help law enforcement out." (*Id*. at 7.) The district court found that Drapeau's testimony, to the extent it conflicted with these findings, was not credible (*id*. at 8), and this credibility finding is not clearly erroneous.

Drapeau's unprompted offer of cooperation was "an effective reversal" of his previously expressed desire not to talk to agents "at that time." *See Thompson*, 866 F.2d at 271. His actions do not represent a "clear, consistent expression of a desire to remain silent." *Id*. at 272. We therefore hold that Drapeau did not effectively assert his right to remain silent, and we need not address whether his right to remain silent was "scrupulously honored" under *Mosley*.

B.

Drapeau's second argument is that the district court impermissibly allowed the jury to hear testimony from Big Eagle that she previously purchased drugs from Drapeau. Federal Rule of Evidence 404(b) makes inadmissible "[e]vidence of other

crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith," but permits the introduction of such evidence to prove motive, opportunity, intent, preparation, plan, knowledge, or identity, or to show absence of mistake or accident. We review a district court's admission of evidence under Rule 404(b) for abuse of discretion. *United States v. Crenshaw*, 359 F.3d 977, 998 (8th Cir. 2004).

Drapeau argues that Big Eagle's testimony was inadmissible under Rule 404(b), because it was offered only to show Drapeau's propensity to distribute drugs. Our circuit requires that evidence meet four criteria for admissibility under Rule 404(b). *United States v. Williams*, 308 F.3d 833, 837 (8th Cir. 2002). First, the evidence must be relevant to a material issue. *Id*. Second, it must be similar in kind and "not overly remote in time to the charged crime." *Id*. Third, the evidence must be "supported by substantial evidence." *Id*. Last, its probative value must outweigh any unfair prejudice. Fed. R. Evid. 403; *Williams*, 308 F.3d at 837.

Applying these criteria, we conclude that the district court did not abuse its discretion in permitting Big Eagle's testimony regarding Drapeau's prior distribution of drugs. Evidence of a defendant's prior drug sales is probative of his intent to distribute, *United States v. Harris*, 352 F.3d 362, 365 (8th Cir. 2003), and intent to distribute was an element of one of the charged offenses. Prior drug distributions also may, in appropriate circumstances, be relevant to proving a defendant's motive, *United States v. Coleman*, 284 F.3d 892, 894 (8th Cir. 2002), opportunity, *cf. United States v. Templeman*, 965 F.2d 617, 619 (8th Cir. 1992), preparation, *Coleman*, 284 F.3d at 894, plan, *United States v. Haynes*, 881 F.2d 586, 590 (8th Cir. 1989), knowledge, *United States v. Adams*, 401 F.3d 886, 894 (8th Cir. 2005), and absence of mistake or accident, *United States v. Shoffner*, 71 F.3d 1429, 1432 (8th Cir. 1995). The prior acts to which Big Eagle testified were similar in kind to those for which Drapeau was charged and not overly remote in time: the prior acts were drug distributions that had occurred within the previous three years. (T. Tr. 43, 55). Big

Eagle's testimony was well supported by other evidence; a Task Force agent testified to Drapeau's admission that he sold drugs to Big Eagle. The jury was instructed that the evidence could be considered only for limited purposes under Rule 404(b), and although Drapeau objected to the admission of the evidence, he did not complain about the specific limiting instruction given to the jury. (Dkt. # 68, Instruction 12; T. Tr. 112-13). We are thus not persuaded that any unfair prejudice outweighed the probative value of the evidence. We discern no abuse of discretion.

## C.

Drapeau argues next that the district court erred in excluding evidence of Big Eagle's kinship to law enforcement personnel. Drapeau maintains that he should have been allowed to impeach Big Eagle's credibility by introducing evidence that her sister was an employee of the United States Attorney for the District of South Dakota and married to one of the FBI agents working on the Task Force that arrested Drapeau. The district court excluded this evidence, reasoning that it was wasteful of time, confusing to the jury, and irrelevant under Federal Rules of Evidence 402 and 403.

We review the district court's decision to exclude evidence for abuse of discretion. *United States v. Martin*, 369 F.3d 1046, 1058 (8th Cir. 2004). The Confrontation Clause of the Sixth Amendment guarantees a defendant's right to cross-examine witnesses and, through cross examination, to expose the motivation of witnesses in testifying. *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986). The right to cross-examine witnesses, however, is not without limitation, even where the subject matter is bias. *Id*. at 679. Trial judges retain "wide latitude" to impose "reasonable limits on such cross examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* The ability of the defendant to achieve through other means the effect that the excluded examination

allegedly would have produced is a factor indicating that his right to confrontation was not violated. *See United States v. Warfield*, 97 F.3d 1014, 1024 (8th Cir. 1996); *United States v. Crump*, 934 F.2d 947, 952-53 (8th Cir. 1991). Limitations on a defendant's opportunity to impeach a witness for bias, moreover, are subject to harmless error analysis. *Van Arsdall*, 475 U.S. at 684.

We conclude that the trial court's decision to disallow Drapeau's cross-examination of Big Eagle on her family connections to law enforcement, while debatable, was not an abuse of discretion. The court reasoned that Big Eagle's sister was not in a decision-making position in the U.S. Attorney's Office, and therefore was powerless to influence any decision regarding Big Eagle's prosecution. The court also excluded evidence that Big Eagle's sister was married to an FBI agent involved in Drapeau's arrest on the basis that the FBI lacked authority to decide whether Big Eagle would have been prosecuted, and that evidence of an FBI connection would thus be minimally probative of Big Eagle's bias. The court further believed that discussion of Big Eagle's brother-in-law would inject into the trial irrelevant issues about Drapeau's desire to cooperate with the FBI agent rather than police officers assigned to the Task Force. These are judgment calls, and we deem them to be within the range permitted by an abuse of discretion standard of review.

Our conclusion is strengthened by the fact that limitation on Drapeau's cross-examination of Big Eagle did not preclude Drapeau from challenging her credibility. Drapeau was permitted to cross-examine Big Eagle regarding sources of potential bias and impeachment, including that she was not prosecuted after a seizure of methamphetamine from her car in 2001, that she hoped her cooperation would lead the prosecutor's office to withhold charges based on that seizure and her admissions of drug activity, and that she continued to use drugs after beginning to cooperate with law enforcement. She also was cross-examined regarding her knowledge of a reward offered by the Crow Creek Sioux Tribe, of which her father was chairman, for information leading to the arrest of drug dealers on the reservation. Drapeau's

opportunity to cross-examine Big Eagle distinguishes his case from *Van Arsdall,* where the trial court did not permit the defendant any inquiry into the possibility of bias, 475 U.S. at 679, and demonstrates that Drapeau was able to achieve much of his desired impeachment through other means. *See Warfield*, 97 F.3d at 1024.

Even if the district court's decision to exclude this evidence was an abuse of discretion, we conclude that any error was harmless beyond a reasonable doubt. *See Van Arsdall*, 475 U.S. at 684. Whether such an error is harmless depends on "a host of factors," including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, and, of course, the overall strength of the prosecution's case." *Id*. While Big Eagle was an important witness, this case involved evidence of a controlled drug transaction, which was recorded on audiotape, and an admission by the defendant that he sold drugs to the informant. Drapeau made use of other avenues to impeach Big Eagle's testimony. The evidence of guilt was very strong – the district court characterized it as "overwhelming," (S. Tr. 33-34) – and any incremental impeachment value of the proffered testimony was modest. We are confident that any error was harmless.

D.

Drapeau's fourth argument is that there was insufficient evidence to support his convictions. When evaluating a challenge to the sufficiency of evidence used by a jury to convict a defendant, we view the evidence "in the light most favorable to the verdict." *United States v. Leisure*, 377 F.3d 910, 913 (8th Cir. 2004). We draw all reasonable inferences that support the jury's verdict, and we will overturn the verdict "only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id*.

-8-

Drapeau maintains that the evidence in his case was insufficient because Big Eagle, the prosecution's "sole substantive witness," was so thoroughly impeached that no reasonable jury could have believed her testimony. Drapeau alleges that Big Eagle's testimony was incredible because she was cooperating with police in the hope of avoiding prosecution for her own drug offenses. Big Eagle's incentives to cooperate, however, are not sufficient to establish that no reasonable jury could have found her credible. The test for rejecting a jury's credibility determinations is "extraordinarily stringent." *Crenshaw*, 359 F.3d at 988. "Testimony does not become legally unsubstantial because the witness stands to gain by lying; the defendant is entitled to cross-examine such witnesses to expose their motivations, and it is up to the jury to decide whether the witness is telling the truth despite incentives to lie." *Id*.

At Drapeau's trial, Big Eagle's motivations were explored on cross-examination, and the jury was free to evaluate her credibility in light of information regarding bias and drug use. Her testimony concerning the April 2002 transaction did not "assert[] facts that are physically impossible," *Crenshaw*, 359 F.3d at 988, and in fact was corroborated by an audio recording and Drapeau's confession in November that he had sold drugs to Big Eagle on six prior occasions. We therefore hold that the testimony presented to the jury in this case "falls well within the zone of evidentiary sufficiency." *Id*. at 991.

E.

After the case was submitted, Drapeau filed a pro se document captioned "Supplement Motion to Amend," in which he argues that the district court lacked jurisdiction over this case, because the statutory jurisdiction provisions of 18 U.S.C. § 1152 do not comply with the "jurisdictional prerequisites of the 1868 Fort Laramie Treaty." Because this argument potentially implicates our subject matter jurisdiction, we grant the motion and consider Drapeau's argument.

Title 18, United States Code, Section 1152 states as follows:

Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

We have held that this statute and its exceptions "do not extend or restrict the application of general federal criminal statutes to Indian reservations." *United States v. Blue*, 722 F.2d 383, 384 (8th Cir. 1983); *see also Stone v. United States*, 506 F.2d 561, 563 (8th Cir. 1974); *United States v. White*, 508 F.2d 453, 454-55 (8th Cir. 1974). Thus, as in *Blue*, the statute establishes no barrier to the prosecution of a tribal member in federal court for a violation of the federal drug trafficking laws. 722 F.2d at 385.

Drapeau argues that the "jurisdiction of the federal courts under 18 U.S.C. § 1152 and 1153 is valid only if, in a given case, that statutory jurisdiction complies with the jurisdictional prerequisites of the 1868 Fort Laramie Treaty." That treaty, between the United States and different bands of the Sioux Nation of Indians, included an article concerning the trial and punishment of tribal members who commit offenses against the United States. *See* Treaty with the Sioux, Apr. 29, 1868, U.S.-Sioux, art. I, 15 Stat. 635. Drapeau draws our attention to the following provision:

> If bad men among the Indians shall commit a wrong or depredation upon the persons or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith, the Indians herein named solemnly agree that they will, upon proof made to their agent and notice by him, deliver up the wrong-doer to the United States, to be tried and punished according to its laws.

*Id*. Drapeau asserts that the issue in this case under the 1868 Treaty is whether federal agents "gave proper and sufficient notice to [the] tribe compelling the tribe under the provisions of the Treaty to 'deliver up [Appellant] to the United States, to be tried and punished according to its law . . . .,' a prerequisite to the implementation of the statutory jurisdictional provisions of sections 1152 and 1153."

We are not persuaded that the 1868 Treaty deprives the federal courts of jurisdiction over this criminal case. First, the district court's jurisdiction was not premised on 18 U.S.C. § 1152; as noted, that statute has no effect on the application of general federal criminal statutes, such as the federal drug trafficking statutes. *Blue*, 722 F.2d at 384. Nor is § 1153 involved in this case; that statute concerns jurisdiction to prosecute certain enumerated "major crimes" other than drug trafficking. *Negonsott v. Samuels*, 507 U.S. 99, 102 & n.2 (1993). The plain language of the treaty, moreover, does not create the sort of "notice" requirement that Drapeau envisions. The treaty does not say that the United States must give notice to an Indian tribe before the government may arrest and prosecute a tribal member who has violated the federal drug trafficking laws. Rather, the treaty imposes *an obligation on the tribe* to "deliver up the wrong-doer to the United States," upon proof and notice to the tribe.

Finally, to the extent the treaty could be construed to impose a notice and request obligation on the United States, we have twice approved the opinion in *United States v. Consolidated Wounded Knee Cases*, 389 F. Supp. 235 (D. Neb. 1975), which held that Congress' grant of citizenship to the Indians, 8 U.S.C.

-11-

§ 1401(a)(2) (now § 1401(b), *see* Pub. L. No. 95-432, § 3, 92 Stat. 1046 (1978)), makes them "subject to all restrictions to which any other American citizen is subject, in any state," and that the "legislative history and the language of the statute itself are sufficient expression of a clear Congressional intent to abrogate or modify any treaty provisions to the contrary." *Id.* at 243 (internal quotation omitted). *See United States v. Kane*, 537 F.2d 310, 311 (8th Cir. 1976) (per curiam); *United States v. Dodge*, 538 F.2d 770, 774-76 (8th Cir. 1976) (rejecting argument that treaty requires the United States "to request 'delivery'" from the Tribe of a suspect prosecuted pursuant to § 1153). Drapeau is subject to arrest for violation of the federal drug laws just as is any other American citizen. For these reasons, we reject Drapeau's pro se challenge to the district court's jurisdiction.

### III.

While this appeal was pending, Drapeau moved for leave to file a supplemental brief on the applicability of *Blakely v. Washington*, 124 S. Ct. 2531 (2004). We denied the motion in anticipation of the Supreme Court's decision on the constitutionality of the United States Sentencing Guidelines in *United States v. Booker*, 125 S. Ct. 738 (2005). In *Booker*, the Court held that the mandatory guidelines were subject to the Sixth Amendment's requirement that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at 756. As a remedy, the Court declared the guidelines effectively advisory in all cases. *Id.* at 764-65.

At Drapeau's sentencing, the district court applied the guidelines as mandatory. The court found that Drapeau's relevant conduct included 1.721 kilograms of drugs, a quantity not found by the jury, and the court applied a two-level adjustment for possession of a dangerous weapon over Drapeau's objection to the finding of fact.

Drapeau objected to his sentence based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), arguing that the court's consideration of drug quantities beyond those found by the jury and possession of a weapon "constitute[d] an *Apprendi* violation." (S. Tr. at 28). Drapeau thus preserved a Sixth Amendment objection, *see United States v. Pirani*, 406 F.3d 543, 549 (8th Cir. 2005) (en banc), and the district court's application of the mandatory guidelines based on judicial findings concerning drug quantity and possession of a dangerous weapon violated the Sixth Amendment as applied in *Booker*. We therefore vacate Drapeau's sentence and remand for resentencing. *See United States v. Adams*, 401 F.3d 886, 900 (8th Cir. 2005). Drapeau's motion for leave to file a supplemental brief in light of *Booker* is denied as moot.

LAY, Circuit Judge, concurring in the judgment of the court.

I write separately because I believe Drapeau's Sixth Amendment rights were violated when he was not permitted to expose Kristy Big Eagle's bias in the form of her familial relationships on cross-examination. However, I concur in the judgment of the court because this violation was harmless error.

The Sixth Amendment guarantees a criminal defendant the right to confront and cross-examine the government's witnesses. *See Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). In attacking a witness' credibility, the criminal defendant may challenge the witness' recollection of events or expose "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Id.* at 316. "*Proof of bias is almost always relevant* because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel*, 469 U.S. 45, 52 (1984) (emphasis added). Accordingly, the criminal defendant's Sixth Amendment right to confront and cross-examine his accuser includes the right to attack the credibility of a government

-13-

witness by exposing to the jury facts that may establish bias.  *See Davis*, 415 U.S. at 318.

While the trial judge retains wide latitude to regulate cross-examination, all limitations placed on a criminal defendant's Sixth Amendment right to confront government witnesses must pass constitutional muster.  The Supreme Court defined the controlling test for constitutional error as follows:

> [A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."

*Delaware v. Van Arsdall,* 475 U.S. 673, 680 (1986) (quoting *Davis*, 415 U.S. at 318).  A "key factor" in determining whether the limitation on cross-examination violated the defendant's right of confrontation is whether the defendant was allowed other means to obtain the effect that the excluded examination would have achieved.  *United States v. Warfield*, 97 F.3d 1014, 1024 (8th Cir. 1996).  "If a reasonable jury might have received a significantly different impression of a witness' credibility had counsel been permitted to pursue the proposed line of cross-examination, defendant has stated a Confrontation Clause violation."  *United States v. Beckman*, 222 F.3d 512, 524 (8th Cir. 2000).

During Drapeau's cross-examination of the government's key witness he was prohibited from exposing that Big Eagle's sister worked as a victim's advocate in the same U.S. Attorney's Office that was prosecuting Drapeau, and that this same sister's husband (Big Eagle's brother-in-law) was one of the FBI agents that arrested Drapeau.  The government resisted Drapeau's offer of proof based on relevancy,

arguing that Drapeau had already shown Big Eagle's bias in the form of favorable treatment.

> It's not relevant to the matters in front of the Court to place in front of this jury for trial who the witnesses' [sic] family members are . . . . This issue would only serve to confuse and mislead the jury into a collateral issue that's not in front of the Court or isn't at trial.

T. Tr. at 95. After concluding that neither Big Eagle's sister nor brother-in-law had any authority at the U.S. Attorney's Office to influence Big Eagle's prosecution, the district court rejected Drapeau's offer of proof.

> [I]t's not relevant and the offer of proof is rejected. It's also wasting time under 403 and trying to confuse the jury. The issue is what happened out there that particular day. The motives of Kristy Big Eagle, to me, don't mean anything anyway. Because, in fact, if that's Mr. Drapeau's voice on the tape, that's all there is to it.

*Id.* at 96.

It was an error of law and therefore an abuse of discretion for the district court to conclude that the bias and motives of the government's key witness did not mean anything. To the contrary, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 316-317. Contrary to the district court's conclusion, evidence of bias is not irrelevant, *see id.* at 317, and contrary to the government's position, "[p]otential bias is not a collateral issue." *Wealot v. Armontrout*, 948 F.2d 497, 500 (8th Cir. 1991); *see also Johnson v. Brewer*, 521 F.2d 556, 562 n.13 (8th Cir. 1975) ("In courtroom parlance, facts showing bias are not collateral.") (internal quotation marks and citation omitted). Big Eagle's familial relationships meant she was potentially biased and it was for the jury "as finder of

-15-

fact and weigher of credibility" to consider evidence of this bias as it pondered Big Eagle's testimony. *Abel*, 469 U.S. at 52. Family bias was hardly a confusing concept for the jury to understand. Furthermore, allowing perhaps a few hours to expose and address this evidence would not have been a waste of time considering Drapeau faced several years in prison, and was in fact sentenced to serve twenty-seven years.

Additionally, exposure of Big Eagle's family relationship to an FBI agent who arrested Drapeau would have bolstered Drapeau's entrapment defense by showing that Big Eagle had motives to participate in the sting operation beyond the favorable treatment she received. It would have provided evidence that law enforcement had unique access to Big Eagle and significant influence over her. In an entrapment defense, the motivations of the government's only cooperating witness can mean very much indeed. It was up to the jury to accept or reject this evidence.

It is admittedly rare that we reverse the district court for a Confrontation Clause violation. But when a criminal defendant is "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias" to impeach the credibility of a critical government witness, constitutional error results. *Van Arsdall*, 475 U.S. at 680; *see also Beckman*, 222 F.3d at 525 (finding violation of Confrontation Clause because limitation on cross-examination prevented defendant from establishing witness' rebuffed sexual advances towards defendant's wife gave witness a motivation to lie and established a distinct form of bias in addition to bias in the form of favorable treatment). The defendant's opportunity to establish other forms of bias does not divest him of his constitutional right to expose relevant and non-cumulative witness bias. *See id.*

Our post-*Van Arsdall* cases affirming the district court's limitation of cross-examination, which are many, generally do so on the basis that the excluded information was cumulative evidence of the same form of bias or that it was irrelevant or collateral. This stands in contrast to the evidence Drapeau sought to expose about

Big Eagle's family relationships. The issue of Big Eagle's family bias was relevant to Drapeau's entrapment defense and it was the only evidence of this particular form of bias. Had the district court merely limited the depth of cross-examination on this point after allowing Drapeau to establish the basic facts of these relationships, I would have no problem deferring to the district court's discretion in the matter. But a total exclusion of all evidence of this family bias leads me to conclude that "a reasonable jury might have received a significantly different impression" of Big Eagle's credibility and her motivation to testify had they known her sister worked in the U.S. Attorney's Office prosecuting Drapeau, and that her brother-in-law was one of the officers who had arrested Drapeau. *Beckman*, 222 F.3d at 524. If I were a juror, I would want to know about this.

While I take issue with the majority's holding that there was no Sixth Amendment violation, I agree the violation was harmless error. *See Van Arsdall*, 475 U.S. at 684 (holding Confrontation Clause violations subject to harmless error analysis). Even without Big Eagle's testimony, there was overwhelming evidence to support Drapeau's conviction. Drapeau made incriminating statements regarding selling drugs to Big Eagle, there was an audio recording of the controlled drug buy, and Big Eagle delivered the purchased methamphetamine to the agents who watched her enter and leave Drapeau's house. Accordingly, I concur that the error was harmless in this case.