# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2428

_____

United States of America,         *
                                    *

        Plaintiff-Appellee,      *

                                    *   Appeal from the United States
        v.                          *   District Court for the
                                    *   Northern District of Iowa.

Dorian Ragland, also known as Big D,  *

                                    *

        Defendant-Appellant.    *

_____

Submitted: September 23, 2008
Filed: February 11, 2009

_____

Before RILEY, HANSEN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

This appeal arises from the retrial of Dorian Ragland on charges that he distributed heroin resulting in death. The first trial ended with the district court[1] granting a motion for a mistrial after several days of jury deadlock. After the second trial, a jury found Ragland guilty of distribution of heroin resulting in death, in violation of 21 U.S.C. § 841(a)(1). Ragland was sentenced pursuant to 21 U.S.C. § 841(b)(1)(c). Ragland appeals several evidentiary rulings by the district court at trial,

_____

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

as well as the sufficiency of the evidence supporting his conviction. We find no reversible error in the district court's rulings, and we affirm Ragland's conviction.

I.

Zack Lane died on the morning of January 10, 2001, from central nervous system depression caused by a combination of drugs, including heroin. According to witness testimony at trial, Ragland, also known as "Big D," was a heroin dealer in Cedar Rapids, Iowa, and was one of Lane's sources of heroin. Witnesses testified that Ragland was present in Lane's apartment on the evening of January 9, 2001, and that he supplied heroin to Lane that evening.

Larry Simpson, one of the Government's cooperating witnesses, testified that he sold cocaine to Ragland in 1999 and that, in 2000 or 2001, Ragland asked Simpson to invest money into a Cedar Rapids heroin trade with Ragland so that Ragland could repay drug debts that he owed Simpson. Simpson declined the offer. Simpson testified that on one occasion in 2000 or 2001, while in Cedar Rapids, he saw Ragland with heroin and Ragland appeared ready to make a transaction.

Simpson also testified about his own criminal activities. Simpson is a former member of a Chicago gang, and he has six Illinois felony convictions. After he pleaded guilty in federal court to distributing 91 grams of cocaine, he was sentenced to 262 months' imprisonment in June of 2003. During direct examination, Simpson testified that, as part of his plea agreement, he had agreed to tell law enforcement authorities what he knew about drug trafficking in Iowa and Chicago. His sentence was reduced to 197 months based on his cooperation. Simpson testified that he hoped to get a further reduction in his sentence by providing testimony against Ragland.

On cross-examination, Ragland's counsel asked Simpson a series of questions about Simpson's plea agreement and specifically about Cedar Rapids drug dealers that

Simpson had already identified. After discussing more than a dozen drug dealers previously identified by Simpson, the Government objected. Ragland's counsel explained, out of the jury's hearing, that Simpson "told the police all this, about all these individuals, and he never once mentioned Dorian Ragland and this investment in heroin. So I'm leading up to that question, and I'm almost done." The district court sustained the Government's objection and did not allow Ragland's attorney to enumerate additional previously identified drug dealers, concluding that to the extent relevant, such examination was "outweighed by waste of time."

Ragland's counsel then continued to question Simpson regarding his plea negotiations with law enforcement. Simpson claimed that he mentioned Ragland in his original December 5, 2002, meeting with police detectives, but he acknowledged that Ragland was not included in the detectives' report from that interview. Simpson further testified on cross-examination that, in hopes of a sentence reduction, he wrote letters in July of 2003 to the U.S. Attorney's office in which he claimed to have more information. He admitted, however, that he did not mention Ragland in those letters. After discussing another meeting with law enforcement officials in which Simpson identified additional Chicago drug dealers, Simpson confirmed that he had not mentioned Ragland to officials at that meeting either. Ragland's counsel then continued to question Simpson about his motivation for testifying, confirming that Simpson's sentence had been reduced the last time that he testified and establishing that Simpson hoped that his sentence would be reduced again by now testifying against Ragland.

Cooperating witness Matthew Fountain testified that he met Ragland in 2000 or 2001 and had purchased heroin from Ragland approximately ten to fifteen times. Fountain testified that he would occasionally trade drugs with Lane. He testified that he observed Lane purchase heroin from Ragland on two occasions in 2000 or 2001. He further testified that there were several other heroin dealers in Cedar Rapids.

Fountain also testified regarding his own criminal history. At the time of his testimony, Fountain was in federal custody after pleading guilty to conspiracy to distribute 100 grams or more of heroin. Fountain testified that when he was arrested on the conspiracy charge on October 26, 2006, government agents questioned him at length regarding the heroin market in Cedar Rapids. Fountain testified that although he had identified sixteen heroin dealers, he had not mentioned Ragland at that time. His 37-month sentence was subsequently reduced to 30 months for this earlier cooperation. On cross-examination, Fountain stated that by testifying against Ragland he was hoping to receive a further sentence reduction. After questioning Fountain about his heroin-transporting trips between Cedar Rapids and Chicago, Ragland's counsel attempted to question Fountain regarding a trip Fountain had taken to San Francisco to bring back thousands of ecstasy pills. The district court curtailed this questioning after the Government objected.

Mindi Lawless testified under a limited-use immunity agreement that she had purchased heroin from Ragland approximately ten times between about 1999 and 2002. Detective Lance Miller, who was present when federal agents questioned Lawless on April 7, 2006, testified that a report from that initial interview only states that Lawless purchased a quarter-gram of heroin from Ragland in 2002. When questioned about this apparent discrepancy, Lawless stated that the topic of that interview was not Ragland and that the discussion did not include any details regarding her interactions with Ragland.

Andrew Grief testified that he had used heroin with Lane a dozen times at most between 1999 and 2000. He testified that he and Lane shared heroin and bought and sold heroin from each other. Over Ragland's objection, Grief testified that Lane told him that "Big D" was Lane's source of heroin. The district court conditionally admitted the testimony pursuant to the procedures outlined in United States v. Bell, 573 F.2d 1040 (8th Cir. 1978). Grief testified that "Big D's" heroin was of higher quality than heroin from other sources. He also testified that there were a number of

other heroin dealers in Cedar Rapids at the time, including Ricky Black and another dealer with the nickname "D."

Ray Hardman testified that he had used cocaine, marijuana, and heroin with Lane in 1999 and 2000. Over Ragland's objection, Hardman testified that Lane had informed Hardman that "Big D" was one of Lane's two primary heroin sources. Hardman testified, over objection, that in the afternoon or early evening of January 9, 2001, Lane called him and asked to borrow his digital scale. Hardman testified that Lane told Hardman that he was getting some heroin and needed the scale to weigh it. Hardman testified that when he dropped off the scale at Lane's apartment only Lane was present. When Hardman returned later that evening to pick up the scale, Lane, Ragland, Ricky Black, and a woman were present. Hardman testified that there was a plate of heroin on the coffee table that had not been there when he dropped off the scale and that he saw Lane and Black snort lines of heroin. He further testified that the heroin had been cut with sleeping pills and that he saw empty sleeping pill capsules. Hardman testified that he stayed for fifteen to twenty minutes and that he never saw Ragland touch, bag, package, or cut the heroin.

Megan Ballard testified under a limited-use immunity agreement that she had used a range of drugs, including heroin, with Lane socially. She testified that she had used drugs with Lane approximately ten to fifteen times per month during an earlier summer and that she had used heroin with Lane as often as every weekend and possibly three times a week during that same summer. Over Ragland's objection, Ballard testified that Lane would often refer to "Big D" when speaking about heroin and that he would refer to Big D as his source, making statements such as, "I'm meeting up with Big D later so I should have some later tonight." Ballard also identified Fountain and a dealer known as "Q" as Lane's other heroin sources.

Dana Konicek testified that she used numerous drugs, including heroin, with Lane. She testified that she was at Lane's apartment on January 9, 2001, from

approximately 7:00 p.m. until midnight and that when she arrived Ragland was already there and heroin was on a plate on the coffee table. Konicek purchased marijuana from Lane. She testified that she saw Ragland and Lane "bagging up" the heroin. Konicek smoked some of the marijuana and snorted some of the heroin on the plate. On cross-examination, she could not remember who had given her the plate of heroin and admitted that the heroin had "kind of messed [her] up." She testified that she did, however, recall Lane using heroin repeatedly that night. Konicek testified that she did not see any money exchange hands between Ragland and Lane and that she did not see Ragland use any of the heroin. Konicek also testified that Ricky Black arrived at Lane's apartment to buy heroin between 8:00 p.m. and 9:00 p.m. and that Ragland was not present at that time. She further testified that Ragland was not present when Lane's roommate, Sean Quaid, arrived home later that night.

Quaid testified that he and Lane shared and sold numerous drugs, including heroin. Over Ragland's objection, Quaid testified that on January 9, 2001, Lane informed Quaid that Lane was going to get heroin that night from Ragland. On cross-examination, Quaid first admitted that he had told the grand jury that he had only assumed the heroin was to come from Ragland. He then testified that he did not remember whether Lane had identified Ragland as the source.

Quaid testified that he returned to the apartment from work shortly after 11:00 p.m. and found Lane, Ragland, and Konicek there. He testified that there were approximately two grams of heroin on a tray on the coffee table and that Konicek was high on heroin. Quaid testified that Ragland and Konicek each left shortly thereafter and that he had to help Lane into bed. Quaid then used some of the heroin and went to bed. In the morning, he found Lane dead. He flushed the heroin down the toilet and called Hardman. Quaid further testified that Lane frequently used Hardman's scale to weigh cocaine and marijuana but that Lane did not use the scale when packaging heroin.

## II.

Ragland appeals several evidentiary rulings made at his trial: 1) the district court's limitations on his cross-examination of witnesses; 2) the district court's admission of testimony identifying him as Lane's heroin source as co-conspirator statements; and 3) the district court's admission of testimony regarding his alleged prior bad acts. We address each in turn.

A. *Cross-Examination*

Ragland contends that the district court's decisions to limit his cross-examination of Simpson and Fountain were violations of the Confrontation Clause of the Sixth Amendment. "We review evidentiary rulings regarding the scope of cross examination for abuse of discretion, but where the Confrontation Clause is implicated, we consider the matter *de novo*." United States v. Kenyon, 481 F.3d 1054, 1063 (8th Cir. 2007) (internal citation omitted).

"Even if . . . evidence is sufficiently probative to gain admission under [Federal Rule of Evidence] 608(b) . . . a district court may exclude it if its 'probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" Id. (quoting Fed. R. Evid. 403). "The Confrontation Clause similarly contemplates that evidence [impeaching an accuser] may be excluded if the evidence has minimal probative value." Id. at 1063–64 (quotation omitted). Thus, while the Confrontation Clause generally "guarantees a defendant's right to cross-examine witnesses . . . and expose the[ir] motivation," the right to cross-examine a witness "is not without limitation, even where the subject matter is bias." United States v. Drapeau, 414 F.3d 869, 875 (8th Cir. 2005) (citing Delaware v. Van Arsdall, 475 U.S. 673, 678–79 (1986)).

Ragland sought to impeach Simpson by further questioning Simpson as to the fact that Simpson had identified numerous drug dealers to law enforcement without discussing Ragland and that Simpson was motivated to give false testimony against Ragland in order to have his own sentenced reduced. From the cross-examination that the district court did allow, it was already clear that Simpson had discussed a large number of drug dealers with law enforcement authorities. It was clear that Simpson had not mentioned Ragland along with the many others during more than one interview with law enforcement. It was also clear that Simpson hoped to have his sentence reduced further by testifying against Ragland. Cross-examination regarding other drug dealers, in addition to those already discussed, would have added only marginally to any impeachment of Simpson's credibility. United States v. Santisteban, 501 F.3d 873, 879 (8th Cir. 2007) (finding that, based on cross-examination revealing witness was a convicted felon and former cocaine dealer, often lied under oath, and hoped to get a reduction in his sentence for his testimony, "the jury surely understood that [the witness] hoped to benefit from incriminating [the defendant] and that [the witness] had a long history of deceit").

Discussion of Fountain's one-time stint as an ecstasy mule was similarly of limited value because Ragland was permitted to question Fountain about his involvement in the heroin trade, the fact that Fountain had not mentioned Ragland to authorities in his original plea bargain, and Fountain's hope of further sentence reduction for testimony against Ragland. "The ability of the defendant to achieve through other means the effect that the excluded examination allegedly would have produced is a factor indicating that his right to confrontation was not violated." Drapeau, 414 F.3d at 875.

Thus, the district court's limitations on Ragland's cross-examination of Simpson and Fountain were neither abuses of discretion nor violations of the Confrontation Clause.

B. *Co-conspirator Statements*

Ragland also challenges the admission of testimony from several witnesses about Lane's purported statements regarding Ragland's alleged prior heroin distribution. Statements offered against a defendant are not inadmissable hearsay when made by a co-conspirator during the course and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). Ragland argues that the district court should not have admitted statements Lane allegedly made to Grief, Hardman, Quaid, and Ballard identifying Ragland as Lane's heroin source as co-conspirator statements because 1) there was no conspiracy, and 2) even if there were a conspiracy, the statements were not made in furtherance of that conspiracy. We review the admission of out-of-court statements as co-conspirator statements made during and in furtherance of the conspiracy under Rule 801(d)(2)(E) for abuse of discretion. United States v. Cazares, 521 F.3d 991, 998 (8th Cir. 2008).

As required by Bell, the district court conducted hearings regarding the admissibility of Lane's statements to Grief, Ballard, Hardman, and Quaid. 573 F.2d at 1040. The district court found by a preponderance of the evidence that, at the time each statement was made, Lane and the reporting witness were members of a conspiracy. The court also found that each statement was made in furtherance of the conspiracy "because it was to further the goal of the conspiracy[,] which was to sell more drugs." Accordingly, the district court admitted the co-conspirator statements.

Notwithstanding Ragland's argument that establishing the existence of a conspiracy based on otherwise inadmissible statements by alleged co-conspirators might be "dangerously" circular, courts are permitted to consider the out-of-court statements in making this determination so long as the statements themselves do not provide the sole evidence of the conspiracy. United States v. Roach, 164 F.3d 403, 409 (8th Cir. 1999). Here, the co-conspirator statements are not the sole evidence of the conspiracy. Statements from Simpson, Fountain, and Lawless indicate that

Ragland was a heroin dealer. Statements from Hardman and Konicek indicate that Lane obtained heroin from Ragland. Thus, the evidence supported the district court's conclusion that a conspiracy existed.

Even so, not all co-conspirator statements made during the course of a conspiracy are made in furtherance of the conspiracy. "While we interpret the phrase 'in furtherance of the conspiracy' broadly, a statement that simply informs the listener of the declarant's criminal activities is not made in furtherance of the conspiracy." United States v. Davis, 457 F.3d 817, 825 (8th Cir. 2006) (citations and internal quotations omitted). While merely informative statements and statements made simply to impress the listener are not generally "in furtherance of the conspiracy," United States v. Snider, 720 F.2d 985, 992 (8th Cir. 1983), "statements that discuss the supply source for the illegal drugs or identify a coconspirator's role in the conspiracy are considered statements made 'in furtherance' of the conspiracy." Davis, 457 F.3d at 825.

The Government argues that Lane identified Ragland as his source in order to promote his sales and ensure the continuation of the conspiracy and repeat business of his customers. This theory, as applied to Lane's supply of heroin, is not entirely convincing, because most of the people in this conspiracy were friends. Lane was not just a profit-minded supplier, he was also a buyer and a social co-user. Lane and several of the co-conspirators frequently gave drugs to each other, depending on who happened to have drugs at the time. Ultimately, however, it was within the district court's discretion to find that all of these statements were not merely braggery. In a drug conspiracy, even one that is as much social as commercial in nature, discussion regarding the source of the drugs could be considered in "furtherance of the conspiracy," as it goes to the very purpose and viability of the conspiracy. Because giving drugs to others, and sharing drugs with others, even without money or things of value also exchanging, is distribution prohibited by law, a tacit understanding between or among those same drug users that they will be both providers and

-10-

recipients to and from one another on a frequent or continuing social basis (as the evidence in this case demonstrated) constitutes a conspiracy to distribute existing between and amongst them, and comments passing between them concerning sources of supply and the quality of the product available to each of them are made in furtherance of that continuing conspiracy.  No commercial element is required.  See United States v. Ironi, 525 F.3d 683, 689 (8th Cir. 2008) ("Giving drugs to others, even without receiving money in exchange, is distributing drugs under § 841(a)(1)."); United States v. Hester, 140 F.3d 753, 760–61 (8th Cir. 1998) ("Sharing drugs with another constitutes 'distribution' under § 841(a)(1)." (quotation and citation omitted)).  We therefore conclude that the district court did not abuse its discretion in determining that these statements were made in furtherance of the conspiracy and thus admissible under § 801(d)(2)(E).

C.  *Prior Bad Acts*

Ragland also argues that testimony from Simpson, Fountain, and Lawless that Ragland distributed heroin in Cedar Rapids in 1999 and 2000 should not have been admitted at trial because it was too broad in scope and geography.  We review for abuse of discretion the admission of evidence of prior bad acts under Federal Rule of Evidence 404(b).  Davis, 457 F.3d at 823.  Evidence of prior bad acts is admissible if it is: "(1) relevant to a material issue; (2) similar in kind and close in time to the crime charged; (3) supported by sufficient evidence to support a finding by a jury that the defendant committed the other act; and (4) if the potential prejudice does not substantially outweigh the probative value of the evidence."  Id. (citation omitted). "A district court has broad discretion in admitting such evidence and will be reversed only if such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts."  Id. (internal quotation omitted).

The challenged testimony, linking Ragland to heroin distribution during the year leading up to Lane's death, is relevant to the material issue of Ragland's knowledge and intent, and Ragland's alleged distribution was not too remote in time to be relevant.  See, e.g., United States v. Foster, 344 F.3d 799, 801–02 (8th Cir. 2003) (holding prior drug-distribution conviction relevant for knowledge and intent for a distribution charge nine years later); United States v. Felix, 867 F.2d 1068, 1072 (8th Cir. 1989) ("[W]e have repeatedly held that evidence of similar prior drug activity is admissible in drug prosecution cases because a defendant's complicity in other similar transactions serves to establish intent or motive to commit the crime charged.").  Based on the testimony about heroin distribution in 1999 and 2000, a jury could have found that Ragland had distributed heroin during that period.  See United States v. Bower, 484 F.3d 1021 (8th Cir. 2007) (affirming conviction based solely on testimony of co-conspirators and cooperating witnesses).  We normally defer to the district court's judgment balancing prejudice against probative value, and moreover, here, a limiting jury instruction[2] mitigates concerns of prejudice.  United States v. Franklin, 250 F.3d 653, 659 (8th Cir. 2001).  Accordingly, the district court did not abuse its discretion in allowing testimony regarding Ragland's prior heroin distribution.

III.

Finally, Ragland contends that the evidence was insufficient to support his conviction.  "When evaluating a challenge to the sufficiency of the evidence used by a jury to convict a defendant, we view the evidence in the light most favorable to the verdict.  We draw all reasonable inferences that support the jury's verdict, and we will

_____

[2] The district court instructed the jury that: "You may not use this other acts evidence to decide whether the defendant carried out the acts involved in the crime charged in the Indictment. . . .  Remember, if you find that the defendant may have committed other acts in the past, this is not evidence that he committed such an act in this case."

overturn the verdict only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." Drapeau, 414 F.3d at 876–77 (internal quotations and citation omitted). In making such an evaluation, "[i]t is axiomatic that we do not review questions involving the credibility of witnesses, but leave credibility questions to the jury." United States v. Dabney, 367 F.3d 1040, 1043 (8th Cir. 2004).

According to the agreed jury instructions, in order to convict Ragland of distribution of heroin resulting in death, the jury must have found beyond a reasonable doubt that: 1) on or about January 9, 2001, Ragland intentionally transferred heroin to Lane; 2) at the time of the transfer Ragland knew the substance was heroin; and 3) the heroin contributed to Lane's death. See 21 U.S.C. §§ 841(a)(1) and (b)(1)(c). Witnesses testified that Ragland was a heroin dealer, that he supplied heroin to Lane, and that Lane used Ragland's heroin on the night before Lane's death. It is uncontested that heroin contributed to Lane's death early the next morning. "[W]e have 'repeatedly upheld jury verdicts based solely on the testimony of co-conspirators and cooperating witnesses, noting that it is within the province of the jury to make credibility assessments and resolve conflicting testimony.'" Bower, 484 F.3d at 1026 (quoting United States v. Tabor, 439 F.3d 826, 829 (8th Cir. 2006)). The jury's decision to credit the testimony of the witnesses was within its province, and the testimony itself was sufficient evidence for a reasonable jury to find Ragland guilty beyond a reasonable doubt.

\* \* \*

For the foregoing reasons, we affirm the district court's evidentiary rulings and Ragland's conviction.

_____